IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DROPLETS, INC.** | |
| **Plaintiff,** | **Civil Action No. 1:12-cv-02326-CM** |
| | **ECF CASE** |
| **vs.** | |
| **E\*TRADE FINANCIAL CORPORATION ET AL** | **JURY TRIAL** |
| **Defendant(s).** | |

**PLAINTIFF DROPLETS, INC.'S OPENING CLAIM CONSTRUCTION STATEMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND .....................................................................................................1

        A.      The World Wide Web And The Internet In 1999 ....................................1

        B.      The Technology And The Patents-In-Suit ...............................................4

        C.      Brief History Of Droplets: Before And After The *Adobe
                Case* ..........................................................................................................5

        D.      Brief Discussion Of Related Cases .........................................................6

III.    PRINCIPLES OF CLAIM CONSTRUCTION ......................................................7

IV.     LEVEL OF ORDINARY SKILL IN THE ART ....................................................9

V.      ARGUMENT:  DROPLETS' CONSTRUCTIONS SHOULD BE
        ADOPTED ..............................................................................................................9

        A.      "Application" ...........................................................................................9

        B.      "Operating Environment Information" ...................................................12

        C.      "Presentation Information" ....................................................................14

        D.      "Interactive Link" / "Link" ...................................................................15

                1.      *"Interactive Link" And "Link" Are Different
                        Terms* ..........................................................................................15

                2.      *"Interactive Link"* ......................................................................16

                3.      *"Link"* ........................................................................................18

                4.      *Defendants Wrongly Read In An Alleged Disclaimer
                        With Respect To "Interactive Link" And "Link"* ......................19

        E.      "Presentation Client" .............................................................................21

        F.      "Presenting . . . The Application" ..........................................................23

        G.      "Re-Establishing" ..................................................................................24

VI.     CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
   637 F.3d 1292 (Fed. Cir. 2012)......................................................................................11, 19

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)........................................................................................8, 25

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
   677 F.3d 1361 (Fed. Cir. 2012)......................................................................................15, 16

*Daiichi Sankyo Co. v. Apotex, Inc.*,
   501 F.3d 1254 (Fed. Cir. 2007)...................................................................................9, 10, 11

*Droplets, Inc. v. Amazon.com, Inc.*,
   No. 5:12-cv-03733 (N.D. Cal.) ...............................................................................................6

*Droplets, Inc. v. eBay, Inc..*,
   No. 2:11-cv-401 (E.D. Tex.) (Gilstrap, J.)............................................................................6

*Droplets, Inc. v. Nordstrom, Inc.*,
   No. 5:12-cv-04049 (N.D. Cal.) ...............................................................................................6

*Droplets, Inc. v. Williams-Sonoma, Inc.*,
   No. 5:12-cv-04047 (N.D. Cal.) ...............................................................................................6

*E-Pass Techs., Inc. v. 3 Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003).................................................................................7, 12, 17

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010).............................................................................................8

*Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*,
   Nos. 1:07-cv-510 & 1:07-cv-6886, 2010 U.S. Dist. LEXIS 3588 (S.D.N.Y. Jan. 19,
   2010) ..........................................................................................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008)........................................................................................8, 25

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................... passim

*Purdue Pharma L.P. v. Endo Pharm., Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006)............................................................................................8

McKool 883439v8

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985)...................................................................................7, 17

*Stanacard, LLC v. Rebtel Networks, AB*,
    680 F. Supp. 2d 483 (S.D.N.Y. 2010)....................................................................................8

*Superguide Corp. v. DirecTV Enters.*,
    358 F.3d 870 (Fed. Cir. 2004)................................................................................................8

*Takeda Pharm. Co. v. Mylan, Inc.*,
    No. 1:12-cv-24, 2012 U.S. Dist. LEXIS 148196 (S.D.N.Y. Oct. 11, 2012)...........................8

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................................... passim

*Touchtunes Music Corp. v. Rowe Int'l Corp.*,
    727 F. Supp. 2d 226 (S.D.N.Y 2010)...............................................................................8, 17

*Trading Techs. Int'l., Inc. v. eSpeed, Inc.*,
    595 F.3d 1340 (Fed. Cir. 2010)................................................................................................8

## STATUTES

35 U.S.C. § 101................................................................................................................................20

35 U.S.C. § 112..................................................................................................................................7

iii

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| A | United States Patent No. 6,687,745, including Re-Examination Certificate |
| B | United States Patent No. 7,502,838 |
| C | Excerpts of Google - Company - Our History in Depth, retrieved from http://www.google.com/about/company/history/ April 29, 2013 |
| D | Key Facts - Facebook Newsroom, retrieved from http://newsroom.fb.com/Key-Facts on May 3, 2013 |
| E | Wired.com - Sept. 28, 1998: Internet Explorer Leaves Netscape in Its Wake, retrieved from http://www.wired.com/thisdayintech/2009/09/0928ie-beats-netscape/ on May 3, 2013 |
| F | International Telecommunications Union - Top 20 Online Service Providers, 1999, retrieved from http://www.itu.int/ITU-D/ict/statistics/at_glance/Top20ISP.html on May 3, 2013 |
| G | Excerpts of Federal Communications Commission Releases Data on High-Speed Services for Internet Access, 1999, retrieved from http://transition.fcc.gov/Bureaus/Common_Carrier/Reports/FCC-State_Link/IAD/hspd1000.pdf on May 6, 2013 |
| H | Excerpts of Federal Communications Commission Releases Data on High-Speed Services for Internet Access, 2004, retrieved from http://transition.fcc.gov/Bureaus/Common_Carrier/Reports/FCC-State_Link/IAD/hspd0705.pdf on May 6, 2013 |
| I | Excerpts of Federal Communications Commission Releases Data on High-Speed Services for Internet Access, 2008, retrieved from http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-296239A1.pdf on May 6, 2013 |
| J | Excerpts of Federal Communications Commission Releases Data on High-Speed Services for Internet Access, 2011, retrieved from http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-314630A1.pdf on May 6, 2013 |
| K | ETRADE.com Home Page, February 24, 1999, retrieved from http://web.archive.org/web/19990224013923/http://www.etrade.com/cgi-bin/gx.cgi/AppLogic+Home on May 7, 2013 |

| L | Scottrade.com Home Page, November 29, 1999, retrieved from http://web.archive.org/web/19991129023113/http://www.scottrade.com/? on May 7, 2013 |
|---|---|
| M | Ameritrade.com Home Page, November 29, 1999, retrieved from http://web.archive.org/web/19991129004310/http://www.ameritrade.com /? on May 7, 2013 |
| N | Schwab.com Home Page, November 15, 1999, retrieved from http://web.archive.org/web/19991115223357/http://schwab.com/ on May 7, 2013 |
| O | Execerpts of Archive.org - The Wayback Machine - Frequently Asked Questions, retrieved from http://archive.org/about/faqs.php#The_Wayback_Machine on May 3, 2013 |
| P | ETRADE.com Home Page, April 29, 2013, retrieved from http://www.schwab.com on April 29, 2013 |
| Q | Scottrade.com Home Page, April 29, 2013, retrieved from http://www.schwab.com on April 29, 2013 |
| R | TDAmeritrade.com Home Page, April 29, 2013, retrieved from http://www.schwab.com on April 29, 2013 |
| S | Schwab.com Home Page, April 29, 2013, retrieved from http://www.schwab.com on April 29, 2013 |
| T | Declaration of David Berberian Jr., Executed May 10, 2013 |
| U | Complaint (without exhibits), Filed July 31, 2006, Droplets, Inc. v. Adobe Systems Incorporation, No. 2:06-cv-307, Eastern District of Texas |
| V | Excerpts of Docket Listing , Droplets, Inc. v. Adobe Systems Incorporation, No. 2:06-cv-307, Eastern District of Texas, retrieved on May 8, 2013 |
| W | Excerpts of Docket Listing, Droplets, Inc. v. eBay, Inc., No. 2:11-cv-401, Eastern District of Texas, retrieved on May 10, 2013 |
| X | Excerpts of Docket Listing, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California, retrieved on May 10, 2013 |
| Y | Excerpts of Docket Listing, Droplets, Inc. v. Williams-Sonoma, Inc., No. 5:12-cv-4047, Northern District of California, retrieved on May 10, 2013 |

| Z | Excerpts of Docket Listing, Droplets, Inc. v. Nordstrom, Inc., No. 5:12-cv-4049, Northern District of California, retrieved on May 10, 2013 |
|---|---|
| AA | Order Dismissing Google, Dkt. 234, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California |
| BB | Order Dismissing YouTube, Dkt. 233, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California |
| CC | Order Dismissing Facebook, Dkt. 236, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California |
| DD | Order Dismissing Amazon, Dkt. 228, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California |
| EE | Order Dismissing Apple, Dkt. 229, Droplets, Inc. v. Amazon.com, Inc., No. 5:12-cv-3733, Northern District of California |
| FF | Order Dismissing eBay, Dkt. 156, Droplets, Inc. v. eBay, Inc., No. 2:11-cv-401, Eastern District of Texas |
| GG | Order Dismissing Target, Dkt. 43, Droplets, Inc. v. Target Corp., No. 2:12-cv-391, Eastern District of Texas |
| HH | Order Dismissing Merrill Lynch entities, Dkt. 198, Droplets, Inc. v. E*Trade Fin. Corp., No. 1:12-cv-2326, Southern District of New York |
| II | Order Dismissing OptionsHouse entities, Dkt. 202, Droplets, Inc. v. E*Trade Fin. Corp., No. 1:12-cv-2326, Southern District of New York |
| JJ | Order Dismissing Zecco entities, Dkt. 201, Droplets, Inc. v. E*Trade Fin. Corp., No. 1:12-cv-2326, Southern District of New York |
| KK | July 2, 2009 Office Action Response During Re-Examination of '745 Patent |
| LL | Exhibit A to Joint Claim Construction and Prehearing Statement, Dkt. 134, Droplets, Inc. v. eBay, Inc., No. 2:11-cv-401, Eastern District of Texas |
| MM | January 15, 2013 Office Action Response During Re-Examination of '838 Patent |
| NN | MGM Technology Partners techblog - Must-Know URL Hash Techniques for AJAX Applications, retrieved from http://blog.mgm-tp.com/2011/10/must-know-url-hashtechniques-for-ajax-applications/ on May 10, 2013. |

McKool 883439v8

## TABLE OF ABBREVIATIONS

"'745 Patent"              Refers to U.S. Patent No. 6,687,745

"'838 Patent"              Refers to U.S. Patent No. 7,502,838

"Adobe"                    Refers to Adobe Systems Incorporated and entities under its

                           control

"Amazon"                   Refers to Amazon.com, Inc.

"Apple"                    Refers to Apple Inc.

"Charles Schwab"           Refers to all Charles Schwab defendants in this litigation

"Defendants"               Collectively refers to all defendants currently in this litigation,

                           including: Charles Schwab, E*TRADE, Scottrade, and TD

                           Ameritrade

"Droplets"                 Refers to Droplets, Inc.

"eBay"                     Refers to eBay Inc.

"E.D. Tex."                Refers to the United States District Court for the Eastern District of

                           Texas

"Ex."                      Refers to the corresponding Exhibit of the Declaration of Josh

                           Budwin submitted with this brief

"E*TRADE"                  Refers to all E*TRADE defendants in this litigation

"Facebook"                 Refers to Facebook Inc.

"Google"                   Refers to Google, Inc.

"Merrill Lynch"            Refers to all former Merrill Lynch defendants in this litigation

"N.D. Cal."                Refers to the United States District Court for the Northern District

                           of California

"OptionsHouse"             Refers to all former OptionsHouse defendants in this litigation

| "Patents-in-Suit" | Refers to U.S. Patent Nos. 6,687,745 and 7,502,838 |
| "Polaris" | Refers to Polaris Venture Partners (now Polaris Partners) |
| "Scottrade" | Refers to all Scottrade defendants in this litigation |
| "Target" | Refers to Target Corporation |
| "TD Ameritrade" | Refers to all TD Ameritrade defendants in this litigation |
| "USPTO" | Refers to the United States Patent and Trademark Office |
| "YouTube" | Refers to YouTube LLC |
| "Zecco" | Refers to all former Zecco defendants in this litigation |

McKool 883439v8

## I.     INTRODUCTION

Pursuant to the Court's April 26, 2013 order, Droplets respectfully submits this opening brief on the proper construction of disputed claim terms of the '745 Patent and the '838 Patent.

Droplets, the patentee, has marketed and sold Rich Internet Application ("RIA") products for 13 years.  Droplets pioneered RIA technology, inventing a novel way of enhancing the Internet by enabling a faster, richer, and more interactive user experience.  Recognizing the value of Droplets' patented innovations, companies in the software, technology, and finance industries, including Adobe, Google, YouTube, Facebook, Apple, Amazon, eBay, Merrill Lynch, Target, OptionsHouse, and Zecco, have taken licenses and settled disputes related to the Patents-in-Suit.

Defendants, using two flawed strategies, seek to narrow the scope of the claims.  First, Defendants ask the Court to ignore definitions used in the intrinsic record and instead import extraneous limitations into the claims.  As to many of the disputed claim terms, Droplets "acted as its own lexicographer," and Defendants would have the Court jettison the inventors' definitions in favor of their own.  Second, Defendants seek to import non-existent disclaimers and limitations into the claims.  But the law is straightforward: absent a clear and unmistakable claim scope disavowal, no disclaimer may be found and no additional limitations may be read into the claims.   No such clear and unmistakable disclaimers were made, and Defendants' disclaimer arguments should be rejected.

## II.    BACKGROUND

### A.  The World Wide Web And The Internet In 1999

To understand the significance and innovation of the Patents-in-Suit, it is critical to remember that the World Wide Web ("Web") in 1999 (when the '745 Patent's provisional application was filed) was much different than the Web today.

In 1999, Google had just formed, left its garage, and moved into a commercial office.

McKool 883439v8

Ex. C.   Facebook did not exist.   Ex. D.   Microsoft's Internet Explorer finally surpassed Netscape's browsers in market share.   Ex. E.   And the predominant way of connecting to the Internet was dial-up service via providers such as the AOL and EarthLink.   Ex. F.   Dial-up Internet was inexpensive, but it was also slow and inadequate for users seeking to utilize the Internet and Web for multimedia and other bandwidth intensive applications.   High-speed internet access was not widespread in 1999 (and those with access were likely businesses or residents of affluent areas).   As the chart below demonstrates, only recently has high-speed internet become widely available in the U.S.

| Year | U.S. High-Speed Internet Connections (Exs. G–J) |
| --- | --- |
| 1999 | 2.8 Million |
| 2004 | 38 Million |
| 2008 | 77 Million |
| 2011 | 206 Million |

This speed limitation severely hampered the Web experience.   The Web of 1999 consisted of simple text and images (akin to static snapshots of pictures and text) and required time-intensive redrawing of an entire Web page to accomplish a refresh of the content displayed on the page.   Over the dial-up connections of that era, each refresh of the Web page took significant time.   Defendants' websites from 1999 demonstrate the (necessarily) rudimentary nature of the Web at the time.   Defendants' websites, like most commercial sites at the time, were essentially revolving and refreshing "billboards" that displayed information but did not permit user-interaction with the displayed information.

| Defendant | 1999 Screenshot (Exs. K–N)[1] | 2013 Screenshot (Exs. P–S) |
|---|---|---|
| E*TRADE |  |  |
| Scottrade |  |  |
| TDAmeritrade (known as Ameritrade until 2006) |  |  |
| Schwab |  |  |

---

[1] For each of the Defendants, an Archive.org Wayback Machine screenshot is included. "The Internet Archive Wayback Machine is a service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web. Imagine surfing circa 1999 and looking at all the Y2K hype, or revisiting an older version of your favorite Web site. The Internet Archive Wayback Machine can make all of this possible." *See* Ex. O at 1.

McKool 883439v8

**B.  The Technology And The Patents-In-Suit**

Against a backdrop of an Internet with few high-speed internet connections and a Web populated with elementary websites consisting mostly of simple text and billboard images, the inventors of the Patents-in-Suit sought to develop a way to allow one's Web experience to be a richer, faster experience by enabling interaction with Web-based applications.  In order to accomplish this goal, the inventors wanted to make the interaction with Web-based applications similar to that of a user of applications locally installed on a computer: quick to load, interactive, and fast operating.  And they sought to create this experience across any computer network, including the Internet, for any user of any type of computer or operating system, while requiring only a minimal bandwidth (due to the predominate, but limited dial-up Internet service).  Today, this interactive Web-based technology is called RIA technology.  *See* Ex. A Fig. 2.[2]



*FIG. 2*

The applications described by the Patents-in-Suit are not necessarily located on the user's device, though portions may be.  *E.g.*, Ex. A 8:5–15; 11:41–59.  Such applications, even with their functionality provided to a user's device, may reside on a remote server. *E.g.*, *id.* 4:62–64, 8:5–15, 11:30–39, 20:44–48.  Furthermore, such applications, as provided to a user, can be tailored to (or be based on) a particular user's operating system, user interface, accessibility

---

[2] The '838 Patent (Ex. B) is a continuation of the '745 Patent (Ex. A) and they largely share the same specification.  Unless otherwise stated, all citations are to the '745 Patent's specification.

capabilities, or hardware capabilities. *E.g.*, *id.* 11:30–39. And instead of requiring continual refreshes of the entire application, updates to relevant components are received automatically and dynamically presented to a user. *E.g.*, *id.* Fig. 3, 12:54–13:4. Moreover, information regarding where a user left off using his or her application may be stored and maintained to allow for users to quickly and easily begin working where they left off. *E.g.*, *id.* 5:5–9, 24:55–60. The end result is a quicker, more interactive, and easier experience for Web users.

Notably, instead of requiring users to install applications on each computer they use, the Patents-in-Suit allow users with network access to use applications wherever they are—at home, at work, or even on vacation. Users may use the applications on whatever device they may be using—a personal computer, an Apple computer, a Linux workstation, and even a mobile device. *E.g.*, *id.* 10:50–52, 27:23–35. Certain aspects of an application's functionality are provided to a user's device, allowing the user's device to perform certain of the application's tasks. *E.g.*, *id.* 9:8–17, 9:65–10:4, 11:30–39, 11:50–59, 12:3–48. Prior art systems merely "painted" a screen of a remote application on a user's device—all functionality existed remotely, and only the pixels to be displayed were sent to the device. In contrast, the Patents-in-Suit allow the user's device and the server running an application to each perform portions of the application's functionality.

### C. Brief History Of Droplets: Before And After The *Adobe Case*

In 2000, after filing their provisional patent application, two inventors of the Patents-in-Suit founded Droplets in NYC. Ex. T ¶ 6. Droplets immediately began developing its products embodying the Patents-in-Suit, which it began selling in Fall 2000. *Id.* ¶ 8. At its peak, Droplets employed over thirty people. *Id.* ¶ 9. After raising more than $4M in seed capital, Droplets attempted to raise further venture capital in 2001. *Id.* ¶¶ 10–11. However, in the process of this attempt to raise capital, Droplets' trade secrets were misappropriated by Polaris and a company later acquired by Adobe. *Id.* ¶ 11. Due to this misappropriation, Droplets faced increasing

5

competition and was unable to grow as anticipated.  *Id.* ¶ 12.

In 2007, Droplets sued Adobe and Polaris in the E.D. Tex. for infringement of the '745 Patent and misappropriation of trade secrets (the "Adobe Case").  Ex. U.  During the *Adobe* Case, Adobe requested that the USPTO conduct an *inter partes* reexamination, which was granted.  Claim construction was fully briefed in the *Adobe* Case, but the parties settled and the case was dismissed before any claim construction opinion issued.  Ex. V.  On March 11, 2011, a reexamination certificate was issued for the '745 Patent, confirming its validity, with its 26 original claims unchanged and 78 claims added.  *See* Ex. A at 27–31.

Despite the obstacles it has faced, Droplets' customer list has included, among others, the U.S. Army, U.S. Air Force, Eastman Chemical, Siemens, and Samsung.  Ex. T ¶ 17.  And today, Droplets still offers its embodying products.  *Id.* ¶ 18.  While only one customer remains, Droplets is actively developing its products and attempting to attract new customers.  *Id.* ¶ 19.

### D.  Brief Discussion Of Related Cases

After filing three lawsuits in the E.D. Tex. in 2011 and a number of severance and transfer orders, four other Related Cases,[3] each involving the Patents-in-Suit, are pending in the E.D. Tex. and the N.D. Cal.  Exs. W–Z.  Recently many defendants in the Related Cases— Google, YouTube, Facebook, Amazon, Apple, eBay, and Target—have taken licenses to the Patents-in-Suit, settled their disputes with Droplets, and been dismissed.  Exs. AA–JJ.  Likewise, many defendants in this case—Merrill Lynch, OptionsHouse, and Zecco—have also taken licenses, settled their disputes with Droplets, and been dismissed.  *Id.*

---

[3] "Related Cases" refers to the following: (1) this case; (2) *Droplets, Inc. v. eBay, Inc..*, No. 2:11-cv-401 (E.D. Tex.) (Gilstrap, J.); (3) *Droplets, Inc. v. Amazon.com, Inc.*, No. 5:12-cv-03733 (N.D. Cal.); (4) *Droplets, Inc. v. Nordstrom, Inc.*, No. 5:12-cv-04049 (N.D. Cal.); (5) *Droplets, Inc. v. Williams-Sonoma, Inc.*, No. 5:12-cv-04047 (N.D. Cal.).

### III.     PRINCIPLES OF CLAIM CONSTRUCTION

It is a bedrock principle of patent law that the claims define the scope of the patent right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention, unless there is clear evidence in the patent's specification or prosecution history that the patentee intended a different meaning.  *Id.* at 1312–13.  Claim construction is informed by the intrinsic evidence such as a patent's specification and prosecution history.  *Id.* at 1315–17.

When consulting the specification for the purpose of construing claims, courts should "avoid the danger of reading limitations from the specification into the claim."  *Phillips*, 415 F.3d at 1323.  "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments."  *Id.*  The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Id.*  This is due to 35 U.S.C. § 112 (dealing with the requirements of a patent's specification), and the fact that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments."  *Id.*  Limitations in a specification should only be read into claims if the patentee was "his own lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction."  *E-Pass Techs., Inc. v. 3 Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

"Although [it] is correct that the prosecution history is always relevant to claim construction, it is also true that the prosecution history may not be used to infer the intentional

narrowing of a claim absent the applicant's clear disavowal of claim coverage." *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *Purdue Pharma L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  "To be given effect, such a disclaimer must be made with reasonable clarity and deliberateness."  *Superguide*, 358 F.3d at 875; *see also Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010).

Claims may also be instructive as to the meaning of terms or phrases found within them. *Phillips*, 415 F.3d at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms."); *see also Touchtunes Music Corp. v. Rowe Int'l Corp.*, 727 F. Supp. 2d 226, 230 (S.D.N.Y 2010).  Further, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."  Phillips, 415 F.3d at 1314; *see also Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, Nos. 1:07-cv-510 & 1:07-cv-6886, 2010 U.S. Dist. LEXIS 3588, at *9 (S.D.N.Y. Jan. 19, 2010) (citing *Phillips*, 415 F.3d at 1314).  "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314; *see also  Takeda Pharm. Co. v. Mylan, Inc.*, No. 1:12-cv-24, 2012 U.S. Dist. LEXIS 148196, at *22 (S.D.N.Y. Oct. 11, 2012).

Finally, "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  In particular, the Court may properly resolve the parties' dispute simply by rejecting improper, unnecessary, or unhelpful proposed constructions. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325–26 (Fed. Cir. 2012); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *Stanacard, LLC v. Rebtel Networks, AB,* 680 F. Supp. 2d 483, 487–88 (S.D.N.Y. 2010).

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

Claims are to be construed from the viewpoint of a person of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1313.  The level of ordinary skill is a function of many factors, including:   "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).  Considering these factors in the context of the Patents-in-Suit, one of ordinary skill in the art in the 1998–1999 timeframe would have had a B.S. degree, or its equivalent, in computer science.

## V.   ARGUMENT:  DROPLETS' CONSTRUCTIONS SHOULD BE ADOPTED

### A.  "Application"

| Claim Term(s) | Droplets' Proposal | Defendants' Proposal |
|---|---|---|
| application | software that performs work for a user | A computer program that executes specific tasks and produces outputs.<br><br>Because of Droplets' disclaimer, the application must execute on a remote server. |
| This term is present in every asserted claim of the Patents-in-Suit.[4] | | |

With respect to the term "application," in addition to disagreements with respect to the construction of this word, the parties significantly disagree over whether a disclaimer was made. That is, whether the patentee clearly and unmistakably limited claim scope during prosecution. Specifically, the dispute relates to where the "application" can execute.  While Defendants would read in a disclaimer limiting the application solely to remote execution on a server, there was no such clear and unmistakable disclaimer in the intrinsic record.  Droplets' construction, which is

---

[4] To the extent a term is present in an independent claim (I), it is present in all claims depending therefrom.  Droplets asserts 25 claims: (a) '745 Patent: 1 (I), 2, 26 (I), 28, 33, 36, 41, 43, 69, 77, 82, 85, 90, 92; (b) '838 Patent: 1 (I), 2, 4, 6, 11, 15 (I), 16, 18, 20, 29 (I), 30.

based on the specification and prosecution history of the Patents-in-Suit, is not so limited.

Significantly, the patentees acted as their own lexicographers of the term "application" by adopting their own definition of the term.   The term is broadly defined and used in the specification and the prosecution history.  First, in the specification, "application" was broadly used, to allow for both remote execution on a server and for portions of an "application" to run on a user's device—including at least instructions for rendering graphical objects in applications, parameters or data values within applications, and application-specific business logic to process application input.  Ex. A 9:8–17.  The specification includes bountiful support for at least some local execution, as recognized by Droplets' construction (and excluded by Defendants').

- "By providing the operating environment of the requesting client computer 20 to the application server 40, the application server 40 provides information 43 to present the requested applications 41 on the client computer 20. The information 43 includes, for example, instructions 42 for rendering graphical objects within the presented applications 41, default parameters or data values 44 displayed within the applications 41 and application-specific business logic 46 for processing inputs to the applications 41." *Id.*

- "Whether in a web based or stand-alone implementation, the information 43, that is, instructions 42 for rendering graphical objects within the delivered droplet-enabled applications 41, default parameters or data values 44 displayed within the droplet-enabled applications 41 and application-specific business logic 46 for processing inputs to the droplet-enabled applications 41, is provided by the application server 40, in accordance with the operating environment of the requesting client (e.g., the client computer's operating system, user interface and hardware capabilities)." *Id.* 11:30–39.

- "In one aspect of the present invention, the application server 40 may evaluate the capabilities of the client computer 20 and automatically download all or a portion of the application 41 and/or information 43 for local installation on the client computer 20. In this respect, the locally installed application (in the form of, for example, native executables) may execute eliminating, during at least a portion of its execution, the need to receive rendering instructions 42, default parameters 44, or application-specific logic 46 from the application server 40." *Id.* 11:50–59.

*See also id.* 2:12–16, 4:62–64, 8:5–8, 12:3–48 (providing a list of message types, showing some functionality can run on a client's device); *see also id.* 8:56–63, 10:5–11 (noting that Figure 2 shows the "Stock Watcher" application), 22:4–14 (discussing "photo-album application"), 24:7–

10

21 (discussing work performed by an application).

Additionally, in the prosecution history, it was clearly stated that "[a]pplications are software programs designed to perform specific tasks for a user" and that "applications relate to software programs that execute tasks."  Ex. KK at 51–52.  And while the Patents-in-Suit permit the "application" to run on a server, the "application" is software that performs work for a user.  *Id.* at 53.  Droplets' construction of "application"—"software that performs work for a user"—is the meaning of "application" used by the patentees.

In contrast, Defendants' proposal is overly narrow.  First, despite the prosecution history, Defendants would wrongly limit the term by requiring that an "application" be a "computer program" instead of "software."  The prosecution history plainly discusses an "application" as software.  Ex. KK at 51–53.

Second, Defendants' proposal reads in a non-existent disclaimer.  That is, Defendants assert that "Because of Droplets' alleged disclaimer, the application must execute on a remote server."  Defendants are incorrect.  As discussed above, the specification includes abundant support for some portion of an "application" executing locally.  And nowhere in the specification or prosecution history does Droplets expressly state that "applications" must ***always*** "execute on a remote server."  Lack of such an express disclaimer is fatal to Defendants' argument, as a clear and unambiguous disclaimer is required.  *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 637 F.3d 1292, 1297 (Fed. Cir. 2012) (citing *Krippelz v. Ford Motor Co*., 667 F.3d 1261, 1266 (Fed. Cir. 2012); *SanDisk Corp. v. Memorex Prods., Inc*., 415 F.3d 1278, 1286–87 (Fed. Cir. 2005)).

In fact, the specification notes that in the web implementation, the "application" is only "*preferably*" executing on the "application server"—thus contemplating execution elsewhere.  *Id.* 13:37–39 (emphasis added).  And claims should not be limited to embodiments in the

specification, even preferred ones.  *See Phillips* 415 F.3d 1323; *E-Pass*, 343 F.3d at 1369; *Thorner*, 669 F.3d at 1367.  Further cutting against Defendants' disclaimer argument is the fact that the defendants in the E.D. Tex., which involves the same two Patents-in-Suit and the same 25 asserted claims, have not argued that such a terminal disclaimer exists.  Ex. LL at 1.  Instead, those defendants have actually set forth a construction allowing for some functionality of the application executing on a user's device.  *Id.*

In fact, as discussed above, the specification is rife with support for portions of an "application" running on a user's device.  *See, e.g.*, Ex. A 9:8–17, 11:30–39, 11:50–59, 2:12–16, 4:62–64, 8:5–8, 12:3–48.  And the specification further notes that "the invention as set forth in the appended clams is not limited to the precise details of construction set forth above as such other variations and modifications as would be apparent to one skilled in the art are intended to be included within the spirit and scope of the invention." Ex. A 29:58–63.

The Court should reject Defendants' proposal and adopt Droplets' construction.

## B.  "Operating Environment Information"

| **Claim Term(s)** | **Droplets' Proposal** | **Defendants' Proposal** |
|---|---|---|
| operating environment information / information relating to operating environment / operating environment / operating system environment / operating system environment information | information relating to the client computer's operating system, user interface, accessibility, or hardware capabilities | Information identifying client computer hardware. |
| These terms are present in the following asserted '745 Patent claims: 1, 77, and all claims depending thereon, and the following asserted '838 Patent claims: 1, 15, 29, and all claims depending thereon. | | |

With respect to "operating environment information" (collectively, with the terms above, "OEI"), the parties disagree as to whether OEI can include more than hardware, as Defendants suggest.  In fact, Defendants' construction is too narrow and contradicts the intrinsic record.

For OEI, the patentees again acted as their own lexicographer.  For instance, the

specification defines what was meant by OEI by saying that various instructions, parameters, and logic are provided by an application server to a client "in accordance with the operating environment of the requesting client (e.g., the client computer's operating system, user interface and hardware capabilities)." Ex. A 11:38–40. Accessibility is another characteristic the patentees included within OEI. *Id.* 8:63–9:4. ("[T]the plurality of client computers [] may include computer workstations, personal computers and portable devices such as, for example, laptop and notebook computers, PalmPilots, and internet-enabled radio telephones."). So while OEI can include "hardware capabilities," as Droplets' proposal recognizes, it also may include additional information about the operating system, user interface, and accessibility.

Importantly, the specification supports the OEI term being met by the presence of *any* OEI type. The specification includes examples of OEI in differing combinations. In one case, OEI consists of operating system and hardware capabilities. *Id.* 8:63–67. Another example in the specification notes that three OEI types may be combined—operating system, user interface, or hardware capabilities. *Id.* 11:38–40. And this last example shows that the three OEI types are merely examples (using "e.g."), and do not need to necessarily be present together. *Id.*

Defendants' proposal, on the other hand, improperly reads out the various examples of OEI provided by the specification. As explained above, the specification supports requiring the presence of one or more of the at least four distinct—and disclosed—OEI varieties. The intrinsic record fails to support excluding the three other specifically disclosed varieties of OEI. Yet, Defendants' proposal would include within the definition of OEI only one type of OEI contemplated by the patentees—information identifying hardware capabilities—while excluding the other varieties that were plainly contemplated by the patentees in the specification.

Therefore, Defendants' overly narrow proposal that contradicts the specification should

be rejected and Droplets' construction should be adopted.

### C. "Presentation Information"

| **Claim Term(s)** | **Droplets' Proposal** | **Defendants' Proposal** |
|---|---|---|
| presentation information / presentational information / presentation instructions | information for presenting particular functionality to clients having different user interface requirements | Plain meaning. |
| These terms are collectively present in every asserted claim of the Patents-in-Suit. |||

With respect to "presentation information" (and the analogous terms listed above), the parties' disagreement relates to whether the term should be given its particular meaning from the intrinsic record, or whether, as Defendants request, it should not be construed.

The specification repeatedly states that "presentation information" is information for presenting functionality to clients.

- "***Presentational information*** 43 to present and serve, for example, various graphical objects (GUI objects) such as windows, edit boxes, drop-down lists, check boxes, buttons and/or labels included within the application 41, ***is received over the communication connection 54 as the functionality is presented on the display device or monitor of the client computer*** 20." Ex. A 9:65–10:4 (emphases added).

- "The information presented . . . includes at least presentational information providing at least one of instructions for rendering components of the remotely stored application, default parameters and data values exhibited within the components, and application-specific business logic for processing input to the application." *Id.* 4:64–5:4.

*See also id.* 6:14–19, 9:7–17, 11:30–39, 12:49–54.

The specification also notes that functionality is presented on clients with differing user interface requirements. *Id.* 9:18–22 ("[A] droplet application developer creates droplet-enabled applications or served versions of each application ***for presenting particular functionality to client computers having differing user interface ('UI') requirements***.") (emphasis added).

Defendants' proposal fails to account for the specific meaning provided by the patentees. The Court should adopt Droplets' proposed construction.

### D.  "Interactive Link" / "Link"

| Claim Term(s) | Droplets' Proposal | Defendants' Proposal |
|---|---|---|
| interactive link | a link and information relating to an operating state of an application | Software stored on a client computer that restores a previous operating state of a remote application. |
| link | an active field that allows user selection and performance of an action upon user selection[5] | Because of Droplets' disclaimer, an interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL). |
| The term "interactive link" is present in all asserted claims of the '745 Patent.  The term "link" is present in the following asserted '838 Patent claims: 2, 16, and all claims depending thereon. | | |

With respect to "interactive link" and "link," several issues are in dispute:  First, whether different terms, in different claims ("interactive link" in the '745 Patent's claims and "link" in certain '838 Patent claims) should have different meanings; second, whether the terms encompass "software;" third, whether an "interactive link"/"link" must be stored on a client computer despite such a construction conflicting with the claims; and fourth, whether a disclaimer exists in the intrinsic record.

### 1.    "Interactive Link" And "Link" Are Different Terms.

Adopting identical constructions for "interactive link" and "link, as Defendants propose, is improper for several reasons.  First, the patentees understood how to use "interactive link," yet chose to use the broader "link" in the later-filed '838 Patent instead.  Throughout the '745 Patent's claims, "interactive link" is used.  Yet the '838 Patent does not use "interactive link" in its claims.  Instead, it uses the broader "link."  An intentional change in word choice should be given meaning.  *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) ("The general presumption that different terms have different meanings remains.").

---

[5] Droplets' proposed construction of "link" is slightly different than proposed in the E.D. Tex. in September 2012.  *See* Ex. LL at 5–8.  The difference stems from further statements made by the patentees during re-examination of the '838 Patent in a January 15, 2013 Office Action Response.  Droplets anticipates a similar modification to its E.D. Tex. proposal.

Second, the usage of "interactive link" and "link" in the specification evidences their difference. *Compare, e.g.*, Ex. A 2:50–55 ("A link, such as a hyperlink, is created under the communication protocol. By selecting links and employing a web browser, a user may 'navigate' from one document to another, and from one web site to another, to access informational content and services available across the web.") *with id.* 8:31–34 ("Rather, the interactive link 72 can be employed to directly invoke and execute the applications 41 on the application server 40 to provide the requested functionality at the client computer 20.").

Third, the prosecution history demonstrates the distinction between "interactive links" and "links." *See* Ex. KK at 27–28 ("URLs and other location information are merely location data and do not, e.g., connect one part of a program to another program. . .  Internet shortcuts are not graphical representations of interactive links but are instead representation of instructions to perform on an Internet browser."); *see also id.* at 61–62 ("Browsers or Internet shortcuts are not representative of interactive links because they are representative of an Internet browser and contain only URLs"); Ex. MM (discussing only "link" with respect to '838 Patent claims).

Given the choice of language in the claims, the specification and prosecution history, and previous discussion of the terms, "interactive link" and "link" are not synonymous.

    2.    *"Interactive Link"*

With respect to "interactive link," the patentees acted as their own lexicographer.  The specification, in discussing "interactive links," states that they may be used to restore an "operating state" of an application.  *See, e.g.*, Ex. A 4:25–30; *see also id.* 3:66–4:5 ("There is also a need for the interactive link to include facilities for restoring previous operating states of the application as the application is re-presented at a user's computer.").  The specification also discusses types of information that may be used to restore an operating state, including cookies or other files with information relevant to reconnection to an application.  *See, e.g., id.* 3:35–65,

16

3:66–4:5, 5:30–37, 6:39–36, 8:25–34.   For cookies or files with information relevant to reconnection to an application to be used, a "link" is required.   *See* Section V.D.3, *infra*. Without this "link," the information relating to an operating state would be useless.

Defendants' proposal, on the other hand, fails to fully capture the meaning of the "interactive link" term, particularly in light of Defendants requirement that an "interactive link" be "software" that is "stored on a client computer."   Such narrow requirements are not supported by the intrinsic record.   First, the specification and the prosecution of the Patents-in-Suit fail to explicitly equate an "interactive link" with "software."   In fact, during reexamination of the '745 Patent, the patentees noted that "the storage of the ICE-T application as a stand-alone application does not teach the storage of this interactive link," and that "[t]hrough the use of the interactive link . . . the present invention avoids the need to store and execute a separate stand-alone application on each client computer to establish a new connection to a server."   Ex. KK at 25–26. Notably, the Federal Circuit has continually cautioned against reading in limitations, absent a clear reason to do so.   *Phillips*, 415 F.3d at 1323; *E-Pass Techs.*, 343 F.3d at 1369; *Thorner*, 669 F.3d at 1367; *SRI*, 775 F.2d at 1121.

Second, the claims themselves rebut Defendants' assertion that an "interactive link" must be "stored on a client computer."   *Phillips*, 415 F.3d at 1314; *Touchtunes*, 727 F. Supp. 2d at 230.   For example, Claim 1 of the '745 Patent requires: "***storing, on the client computer, an interactive link*** . . . ."   Ex. A 30:20–24 (emphasis added); *see also* '838 Patent Claim 2 Ex. B 30:3–7 (including a similar limitation).   If an "interactive link" were necessarily "stored on a client computer," it would be redundant to restate as much in the claims—it makes little sense to read Claim 1 as "storing, on the client computer, software stored on a client computer that restores a previous operating state of a remote application," as Defendants' construction requires.

17

As well, unasserted Claim 12 (depending from Claim 1) of the '745 Patent requires:  "The method as claimed in claim 1, comprising *transmitting a copy of the interactive link to a next client computer* . . . ."  Ex. A 31:15–21 (emphasis added) '838 Patent Claim 9 Ex. B 30:32–39 (including a similar limitation).  If an "interactive link" were only storable on a "client computer," then Claim 12 would not make sense.  Claim 12 envisions an "interactive link" being transmittable, and thus storable on a server, other computers, and transmittable between them.  Further, unasserted Claim 16 (depending from Claim 1) of the '745 Patent requires: "wherein the *storing of the interactive link comprises storing the interactive link in* . . . *the internet-based repository*."  Ex. A 31:38–47 (emphasis added).  Again, if an "interactive link" were only "stored on a client computer," then the ability to store an "interactive link" on a server—a device that is separate from a client computer—would not be possible.

Thus, Droplets' proposal for "interactive link" should be adopted, as it best reflects the meaning of the term through the entirety of the prosecution history, and it does so without reading in nonsensical and overly narrow limitations as required by Defendants' construction.

### 3. *"Link"*

With respect to "link," the specification broadly defines and describes the term.  *See, e.g.*, Ex. A 2:36–42 ("Sites on the web, generally referred to as web sites, are connected or *linked* together using a special communication protocol such as, for example, Hypertext Transport Protocol (HTTP), and a Uniform Resource Locator (URL) that includes a specific syntax for defining a network connection on the web.") (emphasis added), 2:50–55 ("*A link, such as a hyperlink*, is created under the communication protocol.") (emphasis added).

A link is merely "an active field that user selection causes the browser to perform an action."  Ex. MM at 10; *see also id.* at 20 ("[A] link is text or other data type having actionable features associated with its selection."), 20–21 ("When a user selects a link, the user selection is

interpreted by the processing device to perform an action based on the link, such as accessing another server on the web."). Such an understanding of "link" is encompassed by Droplets' proposed construction. Importantly, and as confirmed in the prosecution (and as is required by Droplets' construction), a "link" requires more than just plain text; it requires something actionable. *Id.* at 9.

Defendants' proposals for "link" and "interactive link" are identical. However, "link" and "interactive link" are not synonymous and Defendants' proposal fails. Section V.D.1, *supra*

                4.      *Defendants Wrongly Read In An Alleged Disclaimer With Respect To "Interactive Link" And "Link"*

Lastly, with respect to both terms, Defendants wrongly attempt to read in a disclaimer.

First, nowhere in the intrinsic record does Droplets expressly disclaim that the terms "interactive link" or "link" include "a bookmark, cookie, shortcut, hyperlink or Internet address (URL)." Lack of such an express disclaimer is fatal to Defendants' argument. *01 Communique*, 637 F.3d at 1297. What does exist in the prosecution history with respect to "link" is a clarification that a "link" cannot be **only plain text**, which by definition is *not* actionable. Ex. MM at 9 ("The Requester obfuscates the known term of a 'link' with 'text.' Text is not actionable when selected, i.e. clicking on an address bar text in a web browser is not actionable. By contrast, a link includes user selection and performance."); *see also id.* 10 (describing a "link" as "an active field that user selection causes the browser to perform an action"), 20 ("[A] link is text or other data type having actionable features associated with its selection."). But, as discussed, and consistent with the prosecution history, Droplets' proposed construction takes into account that a "link" (and an "interactive link") is actionable.

Second, while the Patents-in-Suit may have discussed each of "bookmark," "cookie," "shortcut," "hyperlink," and "Internet address" as prior art, Ex. A 3:35–65, that does not

preclude their use in the limitations, terms, and claims of the Patents-in-Suit.  Improvements on previous concepts are patentable.  *See* 35 U.S.C. § 101 ("Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, *or any new and useful improvement thereof*, may obtain a patent therefor . . . .") (emphasis added).

Third, it is important to put into context prosecution history statements with respect to "link" and "interactive link."  For instance, "link" was discussed during the re-examination of the '838 Patent, at least with respect to the following pieces of prior art: Windows Secrets, Shaw, Orenshteyn, Hickman, and Outlook 98.  With respect to Windows Secrets and Shaw, the art discussed merely plain, unactionable text.  *See* Ex. MM at 9–10 (discussing Windows Secrets), 14 (referring to Windows Secrets when discussing Shaw).  With respect to Orenshteyn, Hickman, and Outlook 98, the art discussed an inactive file incapable of being selected (*i.e.*, it was not actionable).  *Id.* at 14 (Orenshteyn), 20–22 (Hickman), 23 (Outlook 98).

The "interactive link" term discussed during re-examination of the '745 Patent includes additional characteristics not present in the "link" of the '838 Patent—Droplets' proposed constructions recognizes the difference between these two terms.  The "interactive link" term of the '745 Patent was discussed during re-examination, at least with respect to the following pieces of prior art: Gish, Dickman, LeMole and ICE-T.  With respect to Gish and Dickman, the art was only a simple URL, which while sometimes actionable, does not meet Droplets' proposed construction of "interactive link" because that simple URL does not include "information relating to an operating state of an application."  *See* Ex. KK (7/2/09 '745 Re-Exam OA Response) at 27–28 (discussing Gish), 34 (discussing Dickman).  With respect to LeMole, the art was simple bookmarks, simple URLs, and simple icons, which also did not include "information relating to an operating state of an application."  *See id.* at 55–56.  With respect to ICE-T, the art

20

was a standalone application, and Droplets distinguished this art on that basis. *See id.* at 25–26. Droplets' respective constructions of "link" and "interactive link" are consistent with its statements during prosecution of the Patents-in-Suit.

Fourth, Defendants' position fails to account for the ever-evolving meaning and abilities of "bookmarks," "cookies," "shortcuts," "hyperlinks" and "Internet addresses." Due to the evolving nature of the Internet and Web over the past 15 years, the meaning of words in 1999 may vary significantly as compared to their common meaning today. For instance, what used to be called an online diary is now commonly referred to as a blog. And, as a more technical example, while the "#" in a Web or Internet address (*e.g.*, http://www.url.com/#2) may have meant one thing in 1999 (*e.g.*, a specific location on a web page), it is used entirely differently today (*e.g.*, to refer to an application's operating state). *See* Ex. NN (discussing the evolution of "#" in Web addresses).

Droplets' proposed constructions are consistent with the understanding of how the disputed "link" and "interactive link" terms were used at the time the patents were filed.

### E. "Presentation Client"

| Claim Term(s) | Droplets' Proposal | Defendants' Proposal |
|---|---|---|
| presentation client program code / presentation client | software, running on the client, that is capable of receiving user input and presenting remotely stored applications to users[6] | Software installed at the client computer that cooperates either with web browsers when in a web-based environment, or with stand-alone software programs when in other environments. |
| The terms are present in the following asserted '745 Patent claims: 26 and all claims depending thereon, and the following asserted '838 Patent claims: 29 and all claims depending thereon. | | |

With respect to "presentation client" (and the analogous term listed above), the parties

---

[6] Droplets' "presentation client" proposed construction is slightly different than in the E.D. Tex. *See* Ex. LL at 9–10. The difference stems from further discussions between Droplets and Defendants, and Droplets' attempt to resolve issues where possible. Droplets anticipates a similar modification to its E.D. Tex. proposal.

appear to agree that the "presentation client" is "software" and that it is located "on the client." However, the parties disagree as to what the "presentation client" does and whether it is a standalone piece of software that must be installed on the client.

The patentees yet again acted as their own lexicographer for this term, noting various aspects of a "presentation client."  The specification notes that:

- "In accordance with the present invention, the presentation client 25 is a generic, platform independent application program that processes user interface specifications received from the application server 40 and routes user driven events back to the application server 40 utilizing the message formats (e.g., event notification and session commands) discussed above." Ex. A 27:11–17.

- "The presentational client program code, utilizing the communication connection, presents functionality of the remotely stored applications and information on the requesting client computer." *Id.* 6:24–27.

- "In the web based implementation, the droplets™ cooperate with the droplet presentation client 25 and the web browser running on the client computer 20 to establish the communication connection 54 to the application server 40 and to present the droplet-enabled applications 41and information 43 on the web page." *Id.* 10:59–64.

Thus, the specification teaches that the presentation client is software that: (1) runs on the client; (2) presents applications; and (3) receives user input (and routes certain events over a communication connection to an application server).  Droplets' "presentation client" construction comes from the specification's teachings.  It is software that: (1) runs on the client (2) can receive input, and (3) can present applications.

Furthermore, the patentees made clear that in certain embodiments of the invention the "presentation client" may be separate, locally installed software (as Defendants' construction would limit the term) or, in other embodiments of the invention, it may be built into another application, such as a Web browser (which Defendants' construction fails to account for).  For example, the specification of the Patents-in-Suit discusses three instructive, non-limiting scenarios: (1) where the "presentation client" is standalone software (Ex. A 19:64–20:14); (2)

where the "presentation client" is downloaded and used in cooperation with a Web browser (Ex. A 20:15–25); and (3) where the "presentation client" is not separately-locally installed software, but is already built into a Web browser. (Ex. A 20:26–37).

The specification also provides non-limiting examples of built-in presentation clients of Web browsers, such as HTML, Java, ActiveX—where the presentation client is written as an HTML application, a Java applet, or an ActiveX control.  Ex. A 27:36–43 ("In a web based implementation (within a web page), the droplet presentational client 25 is preferably implemented as a Java applet, an ActiveX component, or as a browser plug-in. Each of these implementation technologies presents an interface that is embedded in a web page. The parameters of the HTML tag used to include the droplet presentational client 25 provides the server to connect to and what application to request to the presentational client 25.").  HTML applications, Java applets, and ActiveX controls are not "separate[ly] installed [software] at the client computer that cooperates with web browsers."  Rather, they are applications written in HTML, Java or ActiveX programming languages that make use of a Web browser's engine, a Java Virtual Machine, or an ActiveX plug-in to execute.  Despite the specification's teachings, Defendants' construction might be interpreted to exclude HTML, Java, and ActiveX applications as the "presentation client" of the claims.

Therefore, Defendants' confusing, overly narrow, and specification-contradicting proposal should be rejected, and Droplets' construction should be adopted.

### F.   "Presenting . . . The Application"

| Claim Term(s) | Droplets' Proposal | Defendants' Proposal |
|---|---|---|
| presenting . . . the application / presenting an application / display the application / presenting said invoked | displaying the application and enabling interaction with the user according to the user interface | Displaying the application across a network and enabling interaction with the user according to the user interface requirements. |

| application / presenting . . . applications | requirements | |
|---|---|---|
| | | Because of Droplets' disclaimer, the application must execute on a remote server. |
| These terms are present in the following asserted '745 Patent claims: 1, 26, and all claims depending thereon, and the following asserted '838 Patent claims: 1, 15, 29 and all claims depending thereon. | | |

With respect to the term "presenting . . . the application" (and the analogous term), the parties appear to agree that when an "application" is presented, its functionality and content is displayed according to user interface requirements.  Yet, the parties disagree as to whether the "application" is merely displayed, or whether, as the specification describes, portions of the application may run on the client.  The alleged disclaimer issue was discussed in Section V.A.

In the specification, "applications" and how they are "presented" were broadly defined, including allowing for both the display of an application, as well as for the execution of a portion of an "application" on a user's device—including but not limited to instructions, parameters or data values, and business logic.  *See* Section V.A (discussing the specification's ample support for local execution of portions of an "application"); *see also* Ex. A 9:65–10:4 ("Presentational information 43 to present and serve, for example, various graphical objects (GUI objects) such as windows, edit boxes, drop-down lists, check boxes, buttons and/or labels included within the application 41, is received over the communication connection 54 as the functionality is presented on the display device or monitor of the client computer 20.").

The Court should reject Defendants' overly narrow, specification-contradicting proposal, and adopt Droplets' construction.

## G.  "Re-Establishing"

| **Claim Term(s)** | **Droplets' Proposal** | **Defendants' Proposal** |
|---|---|---|
| re-establishing | Plain meaning. | restoring the previous operating state of a remote application session |
| This term is present in the following asserted '745 Patent claims: 1, and all claims depending thereon, and the following asserted '838 Patent claims: 2, 16, and all claims depending thereon. | | |

24

With respect to "re-establishing," the parties' dispute relates to whether a construction is needed for a term that itself, and within the context of the claims of the Patents-in-Suit, is clear.

As a juror would clearly understand its meaning, particularly in the context of the claims, no construction is needed.  *ActiveVideo*, 694 F.3d at 1325–26; *O2 Micro*, 521 F.3d at 1362; *Phillips*, 415 F.3d at 1314.  Claim 1 of the '745 Patent illustrates the clarity of the term:

> storing, on the client computer, ***an interactive link for selectively re-establishing the second communication connection to the second host computer*** for retrieving the third information and presenting the application and the fourth information.

Ex. A 30:20–24 (emphasis added); *see also* '838 Patent Claim 2 Ex. B 30:3–7.  As Claim 1 shows, an "interactive link" is used for "re-establishing" a communication connection.  *Id.*  That "interactive link" is further used to retrieve "third information" and present an "application" and "fourth information."  *Id.*  Moreover, each of the parties has proposed a construction of "interactive link" that already refers to an "operating state" of an "application."  And, as discussed above, "link" should include no such limitation.  *See* Sections V.D.1 & V.D.3, *supra*. Defendants merely attempt to add limitations and confusion to the term.

The Court should hold that this term will have its plain and ordinary meaning.

## VI.   CONCLUSION

For the foregoing reasons, Droplets respectfully requests that the Court reject Defendants' improper proposals for the disputed terms, and—as appropriate depending on the term—either adopt Droplets' proposal or hold that the term will have its plain meaning.

DATED: May 10, 2013.

Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/  *Josh W. Budwin*

Theodore Stevenson, III, LEAD COUNSEL
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Tel: (214) 978-4974
Fax: (214) 978-4044

Sam F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
MCKOOL SMITH, P.C.
104 E. Houston St., Ste. 300, P.O. Box O
Marshall, Texas 75670
Tel: (903) 923-9000
Fax: (903) 923-9095

Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
James E. Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
MCKOOL SMITH, P.C.
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Tel: (512) 692-8700
Fax: (512) 692-8744

Brett E. Cooper
New York State Bar No. 4011011
bcooper@mckoolsmith.com
Lauren Fornarotto
New York State Bar No. 4804340
lfornarotto@mckoolsmith.com
MCKOOL SMITH, PC
One Bryant Park, 47th Floor
New York, NY 10036
Telephone: (212) 402-9400
Facsimile:  (212) 402-9444

**ATTORNEYS FOR PLAINTIFF
DROPLETS, INC.**

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day, May 10, 2013, the following documents were served electronically, via ECF, on all counsel of record registered to receive ECF notifications in this case: the foregoing Opening Claim Construction Statement and a declaration by Josh Budwin in support, including the attached exhibits.

/s/ <i>Josh W. Budwin</i>

27

McKool 883439v8