**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **DROPLETS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:12-cv-02326-CM** |
| | ) | **ECF CASE** |
| **v.** | ) | |
| | ) | JURY TRIAL REQUESTED |
| **E*TRADE FINANCIAL** | ) | |
| **CORPORATION et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND ............................................................................................................. 2

    A.   The '745 Patent ........................................................................................... 2

    B.   The '838 Patent ........................................................................................... 4

    C.   Droplets' Allegations Against Defendants. .................................................. 4

III.  CLAIM CONSTRUCTION PRINCIPLES ............................................................. 5

IV.   ARGUMENT .................................................................................................................. 7

    A.   "interactive link" ('745 Patent, Claims 1, 26, 43, 92) ............................... 7

        1.   Droplets' "interactive link" cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL). ............................. 8

        2.   Droplets' "interactive link" restores an operating state of a remote application. ............................................................................. 10

        3.   Droplets' "interactive link" is software stored on the client computer. ........................................................................................ 11

    B.   "link" ('838 Patent, Claims 2, 4, 9, 10, 11, 16, 18) ................................. 12

    C.   "application" (all asserted claims – '745 Patent, Claims 1, 2, 26, 28, 33, 36, 41, 43, 69, 77, 82, 85, 90, 92; '838 Patent, Claims 1, 2, 4, 6, 11, 15, 16, 18, 20, 29, 30) .......................................................................................... 14

        1.   An "application" must execute specific tasks and produce outputs. ............ 14

        2.   Droplets' "application" must execute on a remote server. .......................... 15

    D.   "presenting . . . the application" ('745 Patent, Claim 1; '838 Patent, Claims 1, 2, 15, 16) / "presenting . . . applications" ('745 Patent, Claim 26) / "display the application" ('838 Patent, Claim 29) ................................... 18

    E.   "re-establishing" ('745 Patent, Claim 1; '838 Patent, Claims 2, 16) ...................... 18

    F.   "presentation client computer program code" ('745 Patent, Claim 26) / "presentation client" ('838 Patent, Claims 29, 30) ................................... 20

        1.   Droplets' "presentation client" is installed at the client computer. .............. 20

        2.   Droplets' "presentation client" cooperates with web browsers when in a web-based environment. ...................................................... 21

    G.   "information relating to the operating environment" ('745 Patent, Claim 1) / "operating environment" ('745 Patent, Claims 28, 77) / "operating environment information" ('838 Patent, Claims 1, 15) ........................... 22

    H.   "operating system environment information" ('838 Patent, Claim 29) ................... 23

V.    CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011)..........................................................................7, 20

*Bancorp Servs. LLC v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004)...................................................................13

*Bell Atl. Network Servs. v. Covad Commc'ns Grp. Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001)..................................................................6

*Droplets, Inc. v. Amazon.com, Inc.*,
  No. C12-03733, 2013 WL 1563256 (N.D. Cal. Apr. 12, 2013) ..........................4

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009)...................................................................13

*Goldenberg v. Cytogen, Inc.*,
  373 F.3d 1158 (Fed. Cir. 2004)...................................................................8

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011)............................................................. 13-14

*JOAO v. Sleepy Hollow Bank*,
  418 F. Supp. 2d 578 (S.D.N.Y. 2006) ), *aff'd*, 445 F. App'x 359 (Fed. Cir.
  2011) .......................................................................................................6

*Krippelz v. Ford Motor Co.*,
  667 F.3d 1261 (Fed. Cir. 2012).................................................................7

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)..................................................................................5

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004)..................................................................7

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005)..................................................................13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)............................................................. 18-19

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)..................................................................6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................. 5-6, 14

*Rheox, Inc. v. Entact*,
    276 F.3d 1319 (Fed. Cir. 2002)...........................................................................6

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001).........................................................................17

*Seachange Int'l, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)...........................................................................7

*Springs Window Fashions LP v. Novo Indus.*,
    323 F.3d 989 (Fed. Cir. 2003)................................................................... 9-10, 11

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)...........................................................................6

*USHIP Intellectual Props., LLC, v. United States*,
    No. 2012-5077, 2013 WL 1891406 (Fed. Cir. May 8, 2013) .............................6

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007).........................................................................17

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).............................................................................6

*White v. Dunbar*,
    119 U.S. 47 (1886)..............................................................................................2

## Statutes

35 U.S.C. § 112(a) ................................................................................................13

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "Adobe" | Adobe Systems Incorporated |
| "Britton" | U.S. Patent No. 6,654,814 referenced during prosecution as prior art |
| "Charles Schwab" | all Charles Schwab defendants in this litigation |
| "Defendants" | collectively, all Defendants in this litigation |
| "Dickman" | U.S. Patent No. 5,877,765 referenced during prosecution as prior art |
| "Ex." | the corresponding Exhibit of the Declaration of Brian D. Range submitted with this brief |
| "E*TRADE" | all E*TRADE defendants in this litigation |
| "Facebook" | Facebook Inc. |
| "Gish" | U.S. Patent No. 5,768,510 referenced during prosecution as prior art |
| "Google" | Google Inc. |
| "ICE-T" | the ICE-T User's Guide, Sun Microsystems, 1996 referenced during prosecution as prior art |
| "LeMole" | U.S. Patent No. 6,009,410 referenced during prosecution as prior art |
| "Marimba" | the Marimba Website referenced during prosecution as prior art |
| "patents-in-suit" or "patents" | collectively, U.S. Patent Nos. 6,687,745 and 7,502,838 |
| "Scottrade" | all Scottrade defendants in this litigation |
| "Shaw" | U.S Patent No. 6,362,836 referenced during prosecution as prior art |
| "TD Ameritrade" | all TD Ameritrade defendants in this litigation |
| "Van Hoff" | U.S. Patent No. 5,919,247 referenced during prosecution as prior art |
| "the '745 Patent" | Refers to U.S. Patent No. 6,687,745 |
| "the '838 Patent" | Refers to U.S. Patent No. 7,502,838 |

Please note that emphasis throughout the brief is added unless otherwise indicated.

**TABLE OF EXHIBITS**

Ex. A      U.S. Patent No. 6,687,745 (Franco et al.) issued February 13, 2004 with *Inter Partes* Reexamination Certificate issued March 1, 2011.

Ex. B      U.S. Patent No. 7,502,838 (Franco et al.) issued March 10, 2009.

Ex. C      Provisional Patent Application, 60/153,917 entitled "Method and System for Delivering Applications in Client/Server Environment, dated September 14, 1999.

Ex. D      Amendment and Response to Office Action, dated August 12, 2003, excerpted from the U.S.PTO File History for U.S. Patent No. 6,687,745.

Ex. E      Plaintiff Droplets' Opening Claim Construction Brief, *Droplets v. Adobe*, No. 2:06-cv-00307-TJW-CE (E.D. Tex. Mar. 21, 2008), Dkt. 132.

Ex. F      Plaintiff Droplets' Proposed Constructions for Disputed Terms, *Droplets v. Adobe*, No. 2:06-cv-00307-TJW-CE (E.D. Tex. Feb. 8, 2008), Dkt. 120-2.

Ex. G      Plaintiff Droplets, Inc.'s Rebuttal Markman Brief, *Droplets v. Adobe*, No. 2:06-CV-00307 (E.D. Tex. Apr. 17, 2008), Dkt. 140.

Ex. H      Request for *Inter Partes* Reexamination of U.S. Patent No. 6,687,745 by Adobe Systems, Inc. dated August 3, 2007, excerpted from the U.S. PTO File History for the Reexamination of U.S. Patent No. 6,687,745.

Ex. I      Office Action in *Inter Partes* Reexamination, dated Sept. 15, 2008, excerpted from the U.S. PTO File History for the Reexamination of U.S. Patent No. 6,687,745.

Ex. J      Request for *Inter Partes* Reexamination of U.S. Patent No. 7,502,838 by Google Inc. and Facebook Inc. dated September 14, 2012, excerpted from the U.S. PTO File History for the Reexamination of U.S. Patent No. 7,502,838.

Ex. K      Office Action in *Inter Partes* Reexamination, dated Nov. 15, 2012, excerpted from the U.S. PTO File History for the Reexamination of U.S. Patent No. 7,502,838.

Ex. L      Droplets' infringement contentions directed at TD Ameritrade's "Search Suggest" functionality, dated May 29, 2012.

Ex. M      Amendment dated November 17, 2008, excerpted from the U.S. PTO File History for the Reexamination of U.S. Patent No. 6,687,745.

Ex. N      Droplets' infringement contentions directed at Charles Schwab's "Interactive Charts" functionality, dated May 29, 2012.

Ex. O      Amendment and Response to Office Action, dated July 12, 2007, excerpted from the U.S. PTO File History for U.S. Patent No. 7,502,838.

## I.    INTRODUCTION

In 1999, during the height of the dot-com boom, Plaintiff Droplets, Inc. ("Droplets") filed a provisional patent application describing its Constellatia software for "delivering dynamic, interactive GUI-style applications through a Web browser."  Ex. C at 2.  Constellatia failed in the marketplace, but the provisional application resulted in the twenty-five[1] claims of the '745 and '838 Patents that Droplets now asserts against Defendants and others around the country today. The asserted claims are a vague amalgamation of known components of the Internet.

Droplets has tried to use the vagueness of its claims to its advantage, both in this litigation and in other litigation, but Droplets cannot escape its own history.  Previously, to overcome the Patent Office's rejections of its claims in light of prior art, Droplets has made clear and unmistakable disclaimers narrowing the scope of its claims.  Droplets has emphasized to the Patent Office, for example, that (1) its "interactive link" is stored on a client, automatically resumes application sessions, and cannot be a URL, bookmark, or browser icon; (2) "presenting . . . applications" is not satisfied except by "display of an application running on a remote server;" and (3) "re-establishing" must restore the operating state of a previous session.

Now, Droplets asserts its patents against the nation's leading financial services companies to try to use ambiguity in its patents to achieve a financial windfall.  Droplets attempts to construe its patents in an unreasonably broad manner.  Indeed, Droplets takes positions contrary to positions it took when facing rejections of its claims at the Patent Office and in prior litigation with Adobe. For example, Droplets now alleges that an "interactive link" can be a web browser bookmark and denies that "presenting … applications" requires the application to be running on a server.  These positions contradict the narrow claim scope Droplets asserted during patent prosecution.

Such gamesmanship is improper.  As Justice Bradley famously stated in 1886: "Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and

---

[1]      Per the Court's May 21, 2012 Minute Entry and the May 25, 2012 letter to the Court, Droplets asserts '745 Patent (Ex. A) Claims 1, 2, 26, 28, 33, 36, 41, 43, 69, 77, 82, 85, 90, and 92 and '838 Patent (Ex. B) Claims 1, 2, 4, 6, 11, 15, 16, 18, 20, 29, 30.  Defendants' claim construction brief only addresses those claims.

twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. . . . [A]nd it is unjust to the public, as well as an evasion of the law, to construe [the patent claims] in a manner different from the plain import of its terms." *White v. Dunbar*, 119 U.S. 47, 51 (1886).

Droplets' days of treating its claims as a nose of wax must end. There is a lengthy record of what the disputed claim terms mean—in the patents' specification, their prosecution histories, and the prior litigation between Droplets and Adobe—and this Court need only look to Droplets' own prior statements to properly construe the claim scope. Droplets has unequivocally limited the scope of its patent claims, and it should be held to those limitations as a matter of law.

## II.     BACKGROUND

### A.     The '745 Patent

According to its title, the '745 Patent is directed to a "System and Method for Delivering a Graphical User Interface of Remote Applications Over a Thin Bandwidth Connection." Internet technology such as web browsers, web sites, hyperlinks, bookmarks, and cookies all predate the patent. '745 Patent at 2:20-3:65. The '745 Patent purports to improve the internet experience with "an interactive link" that "when selected, retrieves and presents applications and/or information stored at remote locations across the network" and includes "facilities for restoring previous operating states of the application as the application is re-presented at a user's computer." *Id*. at 3:66-4:5. Figure 1 is illustrative:



*FIG. 1*

Item 68 is labeled "LINK" and is "locally stored as the interactive link 72." *Id.* at 8:26-31. "The link 68 is an interactive link presented within the informational content 36 for invoking the applications 41 and retrieving information 43 residing at remote locations on the network 50." *Id.* at 8:46-49.

The Patent Office's initial review of the '745 Patent lasted nearly four years. During prosecution, an examiner rejected all claims, but Droplets overcame the rejection by disclaiming a broad interpretation of its claims. For example, Droplets emphasized that its alleged invention requires that the "presentational information" relate to the "operating environment." Ex. D at 14.

On July 31, 2006, Droplets asserted its '745 Patent in litigation against Adobe. *Droplets, Inc. v. Adobe Systems Inc.*, No. 2:06-CV-307, Dkt. 1 (E.D. Tex.). During the claim construction process, and consistent with the intrinsic record, Droplets admitted that an interactive link is "a data structure, stored outside the browser, selected by the user to directly invoke remotely stored applications." Ex. E at 9. Droplets also proposed that "presenting applications" required "providing functionality of remotely stored applications, and information processed by the applications, over a network," and admitted that the goal of the invention claimed in the '745 Patent "is to give a computer user the experience of a local (i.e., desktop) application even though the application is run from a remote server." Ex. F at 2; Ex. G at 4.

After the claim construction hearing, Adobe and Droplets settled[2] before the court issued a claim construction ruling. Prior to settling, however, on August 3, 2007, Adobe initiated an *inter partes* reexamination of the '745 Patent. Ex. H. On September 15, 2008, the Patent Office rejected all claims of the '745 Patent in light of prior art presented by Adobe. Ex. I. After Adobe and Droplets settled, the reexamination continued on an effectively *ex parte* basis. Once again, Droplets disavowed any broad interpretation of its claims in order to overcome the Patent Office's rejections. *See generally* Section IV, *infra*. In doing so, Droplets confirmed the narrow scope of its invention.

---

[2]    The October 7, 2008 Droplets/Adobe settlement agreement was addressed by this Court's April 4, 2013, summary judgment decision. Dkt. 200.

### B.      The '838 Patent

The '838 Patent is directed at a "System and Method for Delivering Remotely Stored Applications and Information" and resulted from a continuation of the '745 Patent.  The specification of the '838 Patent is substantially[3] identical to that of the '745 Patent.

On September 14, 2012, Google and Facebook submitted a request for *inter partes* reexamination of the '838 Patent to the Patent Office.  Ex. J.  On November 15, 2012, the Patent Office rejected all 38 claims of the '838 Patent as anticipated by prior art.  Ex. K.  Droplets has now settled with Google and Facebook, but the reexamination proceeds forward on an effectively *ex parte* basis.  Droplets has not yet overcome the Patent Office's rejections.[4]

### C.      Droplets' Allegations Against Defendants.

Defendants are leading financial services companies which offer information to customers and prospective customers through their web sites but do not provide any technology akin to Droplets' Constellatia system.  At present, Defendants do not understand Droplets' allegations of Defendants' purported infringement of the Droplets' patents.  Droplets has provided thousands of pages of infringement contentions to Defendants, but the contentions fail to explain specifically where Droplets contends the elements of its claims are found in the accused products.[5]  Indeed, Droplets' infringement contentions are merely a boilerplate recitation of claim language and

---

[3]      The '838 Patent includes language at the beginning of the specification referring to the '745 Patent.  Because of this, the column and line numbering of the '838 Patent does not match the '745 Patent.  For brevity and convenience of reference, patent specification citations in this brief refer to the column and line number of the '745 Patent, but the same text is in the '838 Patent and parallel citations to the '838 Patent are hereby incorporated into this brief as well.

[4]      To the extent Droplets further limits the '838 Patent as a result of this reexamination, its claims may be further narrowed in the future.  Defendants respectfully reserve the right to revisit claim construction or seek to dismiss or stay '838 Patent claims as a result of this ongoing reexamination.

[5]      Droplets' contentions are equivalent to those Droplets provided to Yahoo! in its litigation against Yahoo! pending in the Northern District of California.  In that litigation, Yahoo! moved to compel Droplets to supplement its infringement contentions, and the court granted that motion because "some association between the evidence and the language used in the claim limitations is necessary to understand where each claim limitation is found within the Accused Product," and Droplets' contentions were lacking in this regard.  *Droplets, Inc. v. Amazon.com, Inc.*, No. C12-03733, 2013 WL 1563256, at *5 (N.D. Cal. Apr. 12, 2013).

thousands of pages of cut-and-pasted generic images and text.  To the extent that Defendants can make any sense of the infringement contentions, Droplets appears to assert infringement theories that directly contradict the clear and unmistakable disclaimers made during patent prosecution.

For example, Droplets aligns the "interactive link" element of the '745 Patent to a red box it draws around a generic web browser bookmark found in a bookmark toolbar, as depicted below.



*See* Ex. L (Droplets' infringement contention.  By making this allegation, however, Droplets contradicts its statement to the Patent Office that: "***manual URL address inputs, bookmarks or special browser icons are not the same as an interactive link as claimed.***"  Ex. M at 55.

Similarly, in its infringement contentions, Droplets aligns the claimed "presenting . . . an application" limitation with various functions handled by a web browser using local JavaScript, rather than an application running on a remote server.  *See* Ex. N (Droplets' infringement contention draws a red box around a Charles Schwab stock chart generated by use of local JavaScript).  Again, this allegation contradicts Droplets' position before the Patent Office where Droplets repeatedly explained that presenting an application must be from an application running on a "remote server."  Ex. M at 43, 53. 

## III.    CLAIM CONSTRUCTION PRINCIPLES

The claims of a patent define the scope of the invention.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996).  The claim terms should be construed in the context of the entire patent, including the specification.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313

(Fed. Cir. 2005).  The specification "is always highly relevant to the claim construction analysis." *Id.* at 1315.  For example, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  *Id.* at 1316.  Indeed, "a claim term may be clearly redefined without an explicit statement of redefinition….  [T]he written description of the preferred embodiments can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format."  *Bell Atl. Network Servs. v. Covad Commc'ns Grp. Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citations and internal quotes omitted).  The specification may also help resolve the meaning of an otherwise ambiguous claim term.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Along with the specification, prosecution history is also "intrinsic evidence."  *Phillips*, 415 F.3d at 1317.  Because the prosecution history is the complete record of all the proceedings before the Patent Office, including the applicant's representations regarding claim scope, it "is often of critical significance in determining the meaning of the claims."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "Even when the written description would otherwise support a construction, the prosecution history, which is generated afterwards, can relinquish coverage of that claimed embodiment."  *JOAO v. Sleepy Hollow Bank*, 418 F. Supp. 2d 578, 581 (S.D.N.Y. 2006) (citing *Rheox, Inc. v. Entact*, 276 F.3d 1319, 1325-27 (Fed. Cir. 2002)), *aff'd*, 445 F. App'x 359 (Fed. Cir. 2011).  Moreover, a patentee may not recapture through claim construction the claim scope it gave up during prosecution.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  Indeed, prosecution disclaimer binds a patentee even if the patentee's statements were not offered to overcome a rejection and even if the statements were not necessary to overcome a rejection.  *See USHIP Intellectual Props., LLC, v. United States*, No. 2012-5077, 2013 WL 1891406, at *4 (Fed. Cir. May 8, 2013) (holding that patentee would be held to limiting statements made in prosecution).

Likewise, "applicant's argument [in reexamination] that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011); *see also Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) ("A patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer."). Indeed, "[a]n applicant's argument made during prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005) (citation omitted).

Moreover, statements made by Droplets in the prosecution history of the '745 Patent are important to interpreting the '838 Patent because "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (citation omitted). Indeed, "[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention." *Id*. at 1350.

## IV.   ARGUMENT

### A.   "interactive link" ('745 Patent, Claims 1, 26, 43, 92)

| Droplets | Defendants |
|---|---|
| A link and information relating to an operating state of an application.<br><br>In Adobe litigation: A data structure, stored outside the browser, selected by the user to directly invoke remotely stored applications.  Ex. F at 4. | Software stored on a client computer that restores a previous operating state of a remote application. Based on Droplets' disclaimer, an interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL). |

The "interactive link" lies at the heart of Droplets' alleged inventions. Because the term "interactive link" has no ordinary and customary meaning, the Court "must resort to the remaining intrinsic evidence—the written description and the prosecution history—to obtain the meaning of that term." *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (citations omitted). Thus, the term should be construed "only as broadly as is provided for by the patent itself." *Id.* (citations omitted).

As explained below, Droplets now asks the Court to construe the term "interactive link" more broadly than permitted by either the specification's definition of this term or by Droplets' prosecution disclaimers. Rejection of Droplets' proposal is critical so that Droplets cannot continue to assert that a simple browser bookmark, or similar prior art technology, is the "interactive link" that leads to Defendants' alleged infringement. Instead, as explained below, Defendants' proposal is grounded in the intrinsic record and is the most proper construction.

> ### 1. Droplets' "interactive link" cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL).

Droplets' many clear and unmistakable disclaimers limit the scope of interactive link. For example, when describing the "Background of the Invention" in the specification, Droplets admits that graphical user interfaces (GUIs), windowed operating environments, web sites, URL links, hyperlinks, search engines, bookmarks, and cookies are all in the prior art. '745 Patent at 1:34-56. Droplets also alleges shortcomings in those past technologies. *Id.* at 3:22-65 ("A perceived disadvantage of existing systems and methods…."). Because of these shortcomings, Droplets explains a need for its special "interactive link" identified as the "object and advantage" of its invention:

> Therefore, there is a need for storing an interactive link on a user's computer which, when selected, retrieves and presents applications and/or information stored at remote locations across the network. There is also a need for the interactive link to include facilities for restoring previous operating states of the application as the application is re-presented at a user's computer.

*Id.* at 3:66-4:5; *see generally id.* at 2:36-4:5.  Droplets further states that, unlike the past

technologies, "the interactive link 72 can be employed to ***directly*** invoke and execute the

applications 41 on the application server. . . ."  *Id.* at 8:26-55.

During prosecution, Droplets was even more explicit about the difference between its

"interactive link" and known technologies.  Specifically, in order to distinguish certain prior art,

Droplets explained that "Internet shortcuts do not represent an 'interactive link'."  Ex. M at 27

(emphasis in original) (distinguishing Gish, ICE-T, and Dickman).  Indeed, according to Droplets:

> ***Internet shortcuts*** encapsulate URLs or other location information (Dickman, column 4, line 23-26) and ***cannot perform the functions of interactive links as claimed***.  Internet shortcuts contain only URLs.  An Internet shortcut is used by the operating system to launch a browser to retrieve resources that reside on the Internet at the location of the shortcut (Dickman, column 4, lines 13-18).  URLs and other location information are merely location data and do not, e.g., connect one part of a program to another program.  URLs and other information are elements that inform the browser program to locate certain items.  ***Internet shortcuts are not graphical representations of interactive links but are instead representations of instructions to perform on an Internet browser.***

*Id.* at 27-28; *see also id.* at 34 (presenting similar argument); 61-62 (similar).

Similarly, to overcome other prior art regarding bookmarks and browser icons, Droplets

stated that these technologies cannot be interactive links:

> Adobe and the Office Action improperly mischaracterize the teachings of LeMole because ***manual URL address inputs, bookmarks or special browser icons are not the same as an interactive link as claimed***.  A bookmark is a stored web page location or URL on a browser while a browser icon is a picture that launches a browser application.  Manual URL address input, bookmarks and special browser icons are all browser elements that inform the browser program to locate certain items.  The browser elements are not interactive and do not perform the functions of the interactive link as claimed.

*Id.* at 55 (distinguishing LeMole); *see also* Ex. E at 9 (Droplets' proposal for construction of

"interactive link" during the Adobe litigation was "a data structure, ***stored outside the browser***,

selected by the user to directly invoke remotely stored applications").

Droplets cannot properly assert that Defendants infringe by use of a bookmark after it

disclaimed that position in prosecution.  *See, e.g., Springs Window Fashions LP v. Novo Indus.*,

323 F.3d 989, 994-95 (Fed. Cir. 2003) (confirming that "[t]he public notice function of a patent

and its prosecution history requires that a patentee be held to what he declares during the

prosecution of his patent" and "the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citation omitted). Thus, the Court should reject Droplets' "nose of wax" approach and hold Droplets to its disclaimers.

       **2.**       **Droplets' "interactive link" restores an operating state of a remote application.**

The Droplets patents' common specification repeatedly emphasizes that the interactive link's purpose is to restore the operating state of a remote[6] application:

- "***It is yet another object and advantage of this invention*** to provide interactive links to remotely stored applications and information, wherein when selectively employed . . . a previous operating state of the applications and information may be restored." '745 Patent at 4:25-30.

- "There is also a need for the interactive link to include facilities for restoring previous operating states of the application as the application is re-presented at a user's computer." *Id.* at 4:2-5 (distinguishing alleged invention over prior technologies).

- "The method also includes presenting the application and the second information based upon the presentational information, and storing on the client computer an interactive link for selectively re-establishing  . . . ." *Id.* at Abstract; 5:5-9.

Droplets then confirmed during prosecution that the interactive link must be able to restore operating state. Specifically, during re-examination of the '745 Patent, Droplets was faced with the examiner having rejected nearly every claim of the patent as obvious in light of yet another prior art reference (Shaw). To overcome this prior art, Droplets emphasized:

> [T]here is nothing within Shaw that indicates that this is a communication connection that has been previously established. . . .  In the Shaw system, re-establishing of a communication is performed automatically by the server. The client side simply provides a means for requesting the invocation of services or applications or view documents. ***There is no need for an interactive link [in Shaw] if the server is able to automatically provide resumable application sessions.  An interactive link provides the means for performing the re-establishment in the claims, as opposed to the server in Shaw.***

---

[6]    *See also* Section IV(C)(2), *infra*, explaining why Droplets' application must run on a remote server.

Ex. M at 39; *see also id.* at 41 (Droplets' arguments "are equally applicable to claims 17 and 26"). Thus, to obtain its patents, Droplets repeatedly admitted that the "interactive link" must "provide the means for performing re-establishment" of the application session.

Now in litigation and seeking to accuse products that do not restore operating state, Droplets urges that the interactive link only needs to "relate" to operating state. However, this poses no limitation at all. For example, Droplets would likely argue that "relating" to operating state could mean creating a new operating state. Droplets should be held to its prior statement that the interactive link restores operating state. *See Springs Window Fashions*, 323 F.3d at 994-95.

### 3.    Droplets' "interactive link" is software stored on the client computer.

Claim 1 of the '745 Patent is explicit that the interactive link is stored on the client computer. Because of Droplets' explanation of the interactive link in the specification and its representations to the Patent Office, the same must also be true of Claim 26. The specification states, for example, "there is a need for storing an interactive link on a user's computer . . . ." '745 Patent at 3:66-67; *see also, e.g., id.* at 5:39-40; 6:5-55; 6:59-61. During prosecution, Droplets then used this aspect of an "interactive link" to distinguish its invention from prior art regarding icons for launching applications:

> Shaw discusses a "webtop" system with icons for user selection, those icons
> providing for launching an application on the application server 280. Shaw
> discusses the server gathering all objects (applications, documents, etc.) associated
> with a user and dynamically creating a web page to represent this information.
> Accordingly, links to applications are not **stored** on the client or the server, rather
> these links are generated by the server in response to a user request.

Ex. M at 38 (emphasis in original); *see also id.* at 41 (Droplets' arguments "are equally applicable to claims 17 and 26"). Because Droplets explicitly disclaimed the claim scope it now seeks to recapture, this Court should reject Droplets' litigation-based construction.

B.      "link" ('838 Patent, Claims 2, 4, 9, 10, 11, 16, 18)[7]

| Droplets | Defendants |
|---|---|
| An active field that allows user selection and performance of an action upon user selection. | Software stored on a client computer that restores a previous operating state of a remote application. Because of Droplets' disclaimer, an interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL). |

"Link" should be construed exactly the same as "interactive link" because the patents' common specification treats the two terms synonymously.  Indeed, with little exception, the specification uses the term "interactive link" and "link" interchangeably dozens of times.

That exception supports Defendants' construction because the specification notes that, **in the prior art,** a link may be a hyperlink.  '745 Patent at 2:51-52.  In all instances where "link" is referred to in the same context as the disclosed invention, however, "link" is used interchangeably with and as shorthand for "interactive link."  For example, the key figure in the patent, Figure 1, lists an Item 68 with the label "LINK."  The specification explains that item 68 "LINK" is "now locally stored as the interactive link 72."  *Id.* at 8:29-30.  Other passages confirm that "link" is shorthand for "interactive link":

- "Accordingly, the interactive links may be selectively stored in the desktop-based repository or in the internet-based repository.  Alternatively, the links are stored in both of the desktop-based repository and the internet-based repository."  *Id.* at 5:60-64.

- "[T]he system includes a device for transmitting and storing a copy of the interactive links at a next client computer.  When the links are stored. . ."  *Id.* at 6:59-61.

- "[D]roplet handles . . . may be selected and downloaded to store, on a client computer 20, the interactive links (e.g., links 72 of FIG. 1) to droplet-enabled applications 41remotely stored across the network 50."  *Id.* at 10:44-49.

- The section of the patent entitled "Downloading Interactive Links to Droplet-enabled Application and Information" repeatedly refers to how "links" may be downloaded "via a drag and drop operation."  *Id.* at 14:31-61.

---

[7]     Droplets does not assert Claims 9 or 10 of the '838 Patent against Defendants, but construction of these claims is still important because Claim 11 depends on Claims 9 and 10 (and therefore incorporates their language).

- "When dropped, the file (e.g., files 74 of FIG. 1) is associated to the interactive link (e.g., links 72 of FIG. 1).  The file includes information for re-establishing the communication connection 54 to the application server 40 as the link is selected, as is discussed below."  *Id.* at 16:36-40.

- "[N]ot only is a locally stored interactive link provided for invoking remotely stored applications and information, but the link may also be visually customized to resemble a commercial image such as, for example a corporation's business name and/or logo."  *Id.* at 18:12-17.

Indeed, the specification uses interactive link at its beginning, uses link and interactive link interchangeably in its middle, and uses link at its end, thus suggesting the term "link" is used only for brevity.  When "link" is used by itself in the latter part of the specification, it is used in the same context and performs the same functions as the "interactive link."  Consequently, the only logical conclusion is that "interactive link" and "link" refer to the same thing.  *Cf. Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329-1330 (Fed. Cir. 2009) (holding "graft" and "intraluminal graft" should be construed to cover same subject matter based on specification and prosecution history) (citations omitted); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (holding "board" and "wood decking board" could cover the same subject matter based on written description); *Bancorp Servs. LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1374-75 (Fed. Cir. 2004) (holding terms "stable value protected investment," "surrender value protected investment," and "SVP" were synonymous given correspondence between claim language and specification language).

In contrast to Defendants' construction grounded in the intrinsic record, Droplets' construction is so broad that Droplets will likely allege that a "link" in the '838 Patent could be merely a hyperlink—something the patentee readily admitted was prior art and disclaimed.  '745 Patent at 2:51.  Indeed, the patent never states that the alleged invention could use links that are not interactive links to accomplish functions such as, for example, re-establishment of a session with a host computer (as in the '838 Patent, Claims 2 and 16).  *Cf. Edwards Lifesciences LLC*, 582 F.3d at 1329-30.  Indeed, there is no support in the written description, as required by 35 U.S.C. § 112(a), for a "link" having the broad meaning proposed by Droplets.  *See, e.g., In re Katz Interactive Call*

*Processing Patent Litig.*, 639 F.3d 1303, 1320 (Fed. Cir. 2011) (affirming summary judgment of invalidity where specification did not disclose claimed display of caller-entered customer numbers).  Rather than allowing Droplets' "link" claims to cover an alleged invention that is unsupported by the '838 Patent's specification, the Court should construe "link" identically to "interactive link."  *Cf. Phillips*, 415 F.3d at 1327 (explaining that ambiguous claims should be construed to preserve validity where practicable).

      C.     "application" (all asserted claims – '745 Patent, Claims 1, 2, 26, 28, 33, 36, 41, 43, 69, 77, 82, 85, 90, 92; '838 Patent, Claims 1, 2, 4, 6, 11, 15, 16, 18, 20, 29, 30)

| Droplets | Defendants |
|---|---|
| Software that performs work for a user. | A computer program that executes specific tasks and produces outputs.  Because of Droplets' disclaimer, the application must execute on a remote server. |

Proper construction of the term "application" is important because, in its infringement contentions, Droplets appears to accuse as the claimed "application" certain processes that are not applications and/or are local JavaScript (prior art technology that resides at a client computer).  But as explained below, this broad reading of "application" is inconsistent with ordinary meaning and is inconsistent with Droplets' clear and unmistakable disclaimers in prosecution.  In contrast, Defendants' construction is correct because it is consistent with the plain meaning of "application" and acknowledges that Droplets unequivocally limited the term's scope during prosecution.

      1.     An "application" must execute specific tasks and produce outputs.

The plain and ordinary meaning of an application is a computer program that executes specific tasks and produces outputs.  During reexamination, Droplets endorsed this definition to overcome the Patent Office's rejections based on the LeMole prior art.  LeMole related to presentation of advertising, and Droplets said it was distinguishable from its invention because advertising is ***information***, not an application.  In particular, Droplets explained: "Information

-14-

relates to data and messages whereas *applications relate to software programs that execute tasks and produce outputs as a result of the interaction between information*."[8]  Ex. M at 52.

Droplets' current proposal that an application is "software that performs work for a user" is overly broad and ignores the limitations that Droplets itself placed on "application" during prosecution.  Indeed, Droplets will likely assert that its construction covers any software that performs work for a user including, potentially, back-end processes or automated tasks invisible to the user.  Consistent with this Court's opinion in addressing the Adobe summary judgment motion (Dkt. 200), "software" and "application" are not the same thing and do not have the same meaning. Accordingly, the Court should reject Droplets' overbroad proposal and restrict the scope of "application" to be consistent with Droplets' statements during patent prosecution.

### 2.  Droplets' "application" must execute on a remote server.

Contrary to the prosecution history, the specification, and Droplets' prior admissions in the Adobe litigation, Droplets now seeks to erase the requirement that the "application" must execute on a remote server.  If Droplets' construction is adopted, Droplets will allege that presenting / displaying can occur locally, and the "application" could be hosted anywhere.  For example, Droplets appears to allege in its infringement contentions that local JavaScript found on the client computer could be the claimed "application."  But it is a fundamental part of Droplets' alleged invention that the "application" is executed on a *remote* server—this is the reason an "interactive link" is required.  Indeed, during the Adobe litigation, Droplets explained:

> [T]he goal and purpose of the '745 Patent is to give a computer user the experience of a local (i.e., desktop) application *even though the application is run from a remote server*.

Ex. G at 4.

Notably, Defendants' position here is consistent with Droplets' disclaimers during patent prosecution.  At least three disclaimers are of particular importance.  First, to overcome a rejection

---

[8]  This Court previously addressed the term "application" in interpreting Droplets' license to Adobe of the patents-in-suit.  Dkt. 200.  In the Court's opinion, it applied a dictionary definition of application: "[a] computer program that performs a specific task, for example, a word processor, a Web browser, or a spread sheet."  *Id.* at 32.  This is similar to the definition Droplets applied in the prosecution history.

of nearly all claims of the '745 Patent as obvious in light of certain prior art (Marimba and Van

Hoff), Droplets explicitly argued that the prior art "presenting . . . the application":

> In the Castanet system, applets do not teach or suggest running applications on a
> remote server but rather, they locally execute applications at a client…. The
> present claims relate to the retrieving of presentation information in order to
> present an application. In other words, the "presenting an application" is the
> presentation of the retrieved presentation information, which is representative of
> display information *for the display of an application running on a remote server,
> as opposed to the execution of channels locally on a client.* On the Castanet
> system, the application is locally executed…. On the other hand, *the claims recite
> the presentation of an application, where this application is not executing on the
> local device by virtue of the recitation of the retrieving and presenting steps.*

Ex. M at 43-44.

Second, Droplets distinguished other prior art references by emphasizing that "*the present

invention avoids the need to store and execute a separate stand-alone application on each client

computer* to establish a new connection to a server, and makes the experience seem to the user

much more like he is executing a local application rather than an application *executing remotely*."

*Id.* at 25-26 (distinguishing Gish and ICE-T). This distinction falls apart if the Court adopts

Droplets' construction and removes the requirement that the application "execut[e] remotely."

Finally, Droplets distinguished a third prior art reference (LeMole) by explaining:

> The manner in which LeMole "presents" an application is different than from the
> presenting of an application as claimed. *The claims are directed to the
> presentation of an application at the client that is running on a server, rather
> than the execution of an application at the client computer.* The applications in
> LeMole . . . do not run on a remote server, but rather through the local browser, the
> client displays the applications (including any execution that may occur, for
> example animation).

*Id.* at 53 (also repeating the "presenting an application" definition above); *see also* Ex. O at 17

(arguing that LeMole "is silent with regard to the presentation of an application and at most

discusses the presentation of content within a browser application executing at a client computer").

Furthermore, Droplets' unequivocal prosecution disclaimers are consistent with the patent

specification. In the patents' common specification, for example:

- The titles of the two patents-in-suit are "System and Method for Delivering a Graphical
  User Interface of *Remote Applications* Over a Thin Bandwidth Connection" ('745 Patent)

and "System and Method for Delivering **Remotely Stored Applications** and Information" ('838 Patent);

• "A method and system are disclosed for delivering interactive links for presenting applications and second information at a client computer from remote sources in a network-configured computer processing system" ('745 Patent at Abstract);

• "The **present invention** relates generally to computer processing systems and, more particularly, to an object-orientated approach for delivering interactive links to **applications and information stored in remote sources of a network**" (*id.* at 1:27-30);

• "[I]t is an object and advantage **of this invention** to provide interactive links to **applications and information remotely stored across a network**" (*id.* at 4:8-11);

• The specification explains that the interactive link "when selected, retrieves and **presents applications and/or information stored at remote locations across the network**" (*id.* at 3:67-4:2);

• "In accordance with **the present invention**…. The application server stores applications that may be invoked for presenting functionality of interest at the client computers." (*id.* at 5:65-6:18); and

• The specification states, referring to Figure 1, that "the application server 40 executes the associated application 41 to present the application functionality and information 43 to the client computer" (*id.* at 8:51-55).

Indeed, these statements are key to understanding "application" because they speak to the "present invention" as a whole rather than any one preferred embodiment. *Cf. Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (limiting term because "[w]hen a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention") (citations omitted); *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (holding that "Summary of the Invention" portion of specification describing "the present invention" excluded broader claim scope that patentee sought in litigation).

Based on the clear and consistent way in which the claims and specification require that the application be remote and given Droplets' unequivocal, clear, and unmistakable prosecution history disclaimers, the Court should adopt Defendants' proposed construction.

**D.** **"presenting . . . the application" ('745 Patent, Claim 1; '838 Patent, Claims 1, 2, 15, 16) / "presenting . . . applications" ('745 Patent, Claim 26) / "display the application" ('838 Patent, Claim 29)**

| Droplets | Defendants |
|---|---|
| Displaying the application and enabling interaction with the user according to the user interface requirements. | Displaying the application across a network and enabling interaction with the user according to the user interface requirements.  Because of Droplets' disclaimer, the application must execute on a remote server. |

The parties agree that these "presenting" terms require displaying the application and enabling interaction with the user according to user interface requirements.  The agreed-upon portion of the construction is supported by the context of the claims in which the "presenting" terms appear as well as the patents' specification.  *See, e.g.,* '745 Patent at 9:18-36.  However, the parties' constructions differ in one important respect:  Droplets seeks to erase the "across a network" aspect of "presenting."  But based on Droplets' clear and unmistakable disclaimers, the patents' specification, and Droplets' admission in the Adobe litigation, as explained in Section IV(C), *supra*, the applications are executed on a remote server and are displayed across the network.  Because claim construction must adhere to this intrinsic evidence, Defendants' construction is the proper one.

**E.** **"re-establishing" ('745 Patent, Claim 1; '838 Patent, Claims 2, 16)**

| Droplets | Defendants |
|---|---|
| Plain meaning | restoring the previous operating state of a remote application session |

As a threshold matter, the parties have a genuine dispute as to the meaning of "re-establishing" that cannot be resolved by ruling that the term should be given its "plain meaning."  As explained below, Droplets uses the term "re-establishing" in two ways in the patents' common specification, but explicitly disclaimed one meaning during prosecution.  Claim construction is necessary here because "ordinary meaning" would not arrive at a meaningful understanding of the limitations of this term or resolve the parties' dispute.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ( "A determination that a

claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

The claims at issue refer to "re-establishing" a second communication connection with the host computer (i.e., a remote server). '745 Patent, Claim 1; '838 Patent, Claims 2, 16.  The remote server/host houses the remote application.  *See* Section IV(C), *supra*.  Thus, the claims themselves suggest "re-establishing" relates to connection with a remote application.  Consistent with the claim language, the specification refers to two kinds of re-establishing.  First, "re-establishing" could refer merely to restarting an application without re-navigating back to the web page that provided the application.  *See, e.g.,* '745 Patent at 16:38-52; 17:35-57.  Second, "re-establishing" could also refer to a "Persistent State Maintenance," which the patents' specification describes as restoring the state of an application "to what it was when the user ended the immediately prior session."  *Id.* at 24:58-60.  Indeed, the specification states: "There is also a need for the interactive link to include facilities for restoring previous operating states of the application as the application is re-presented at a user's computer."  *Id*. at 4:2-5.

Importantly, during prosecution and in order to distinguish Droplets' alleged invention from prior art, Droplets asserted that its invention must include at least the "second" type of "re-establishing."  Droplets explained that the prior art runs "contrary" to the concept of storing "an 'interactive link' to 're-establish' the second communication connection" because the prior art system does "**not** allocate a client device to a specific configuration (e.g. session). . . ."  Ex. M at 32 (emphasis in original) (distinguishing Britton).  Indeed, Droplets stated that "session-specific information" is the "fundamental distinction" between the prior art and Droplets' claims.  By making this distinction, Droplets told the Patent Office that the interactive link's re-establishing does more than just re-start an application—"re-establishing" must restore a previous operating state (as explained in the specification at column 24).  *See also id.* at 56-57 (explaining, for example, that the hyperlink of the LeMole prior art reference does not "re-establish" because in LeMole "[n]ew sessions are always created as a result of dynamically created pages").

-19-

Having explicitly adopted a narrow meaning of "re-establishing" in prosecution, Droplets cannot now reclaim a broader definition of "re-establishing" in litigation by arguing "plain meaning" applies, or otherwise. *Cf. Am. Piledriving Equip., Inc.*, 637 F.3d at 1336. Consequently, the Court should adopt Defendants' construction.

### F.     "presentation client computer program code" ('745 Patent, Claim 26) / "presentation client" ('838 Patent, Claims 29, 30)

| Droplets | Defendants |
|---|---|
| Software, running on the client, that is capable of receiving user input and presenting remotely stored applications to users. | Software installed at the client computer that cooperates either with web browsers when in a web-based environment, or with stand-alone software programs when in other environments. |

The specification is clear that the presentation client is installed at a client computer and cooperates with web browsers when used in a web-based environment.

### 1.     Droplets' "presentation client" is installed at the client computer.

Use of the term "client" itself heavily implies—if not imposes—a requirement that the "presentation client" is installed at the client computer. The patents' specification further confirms the correctness of Defendants' construction. Specifically, Figure 1 depicts the presentation client residing on the client computer:



The patents then refer to the application acting "in cooperation with a presentation client 25

(*installed* at the client computer 20)." '745 Patent at 8:5-13.  Moreover, the patents explain how much space the client installation requires:

> The droplet presentation client 25 requires local storage of about 1M bytes for a complete *installation*.  Once the droplet presentation client 25 is installed locally, the client computer 20 is "droplet-enabled."

*Id.* at 9:46-50.

To bring clarity to what Droplets can and cannot accuse of being a "presentation client," Defendants ask the Court to require the "presentation client" to be installed on the client computer.

### 2. Droplets' "presentation client" cooperates with web browsers when in a web-based environment.

Proper construction of this term is also important because, under Droplets' proposed construction, Defendants expect that Droplets may allege that the web browser itself can be a "presentation client."  However, the term "presentation" itself and the specification teach that the "presentation client" has some presentation function carried out *in cooperation with a web browser*.  Because the presentation client acts *in cooperation with* a web browser, it follows that it cannot itself be the web browser.

In particular, the patents' specification explains the "presentation" function:  "In the web based implementation, the droplets[TM] *cooperate with* the droplet presentation client 25 and the web browser running on the client computer. . . ."  '745 Patent at 10:59-64.  Furthermore, the patents' specification includes many similar passages that separate the presentation client from the web browser.  *See, e.g., id.* at 11:6-13 ("the droplet presentation client 25, the local operating system 80 of the client computer 20 and the web browser or stand-alone software program executing on the client computer 20 *cooperate*. . . ."); 27:23-25 ("the droplet presentation client 25 is designed to *cooperate with* many web browsers of differing vendors").[9]

---

[9]     Additionally, although not relevant to Droplets' allegations against Defendants' web-based systems, the patent leaves open that, when not in a web environment, the presentation client cooperates with other stand-alone software programs.  *Id.* at 11:6-13 ("the droplets[TM], the droplet presentation client 25, the local operating system 80 of the client computer 20 and the web browser or stand-alone software program executing on the client computer 20 cooperate to establish the

No support can be found in the specification for equating a "presentation client" with a web browser, which Droplets' overbroad construction would permit.  Accordingly, the Court should adopt Defendants' proposed construction as consistent with the specification, and reject Droplets' improper attempt to broaden its patent.

G.     **"information relating to the operating environment" ('745 Patent, Claim 1) / "operating environment" ('745 Patent, Claims 28, 77) / "operating environment information" ('838 Patent, Claims 1, 15)**

| Droplets | Defendants |
|---|---|
| Information relating to the client computer's operating system, user interface, accessibility, or hardware capabilities. | Information identifying client computer hardware. |

The patents' specification is clear that while "operating environment" may include other information, it must at least include information that identifies client computer ***hardware***:

- "***In accordance with the present invention*** ….  The information identifying the operating environment on the client computers 20 provides information to the application server 40 regarding the operating system and hardware capabilities of the particular client computer 20 that requested the droplet-enabled content 36.  ***That is, the plurality of client computers 20 may include computer workstations, personal computers and portable devices such as, for example, laptop and notebook computers, PalmPilots and internet enabled radio telephones.*** As is apparent to those in the art, each such ***device platform*** includes differing user interfaces. As such, ***not all client computers 20 are capable of presenting for example, full color, high resolution graphics.*** By providing the operating environment of the requesting client computer 20 to the application server 40, the application server 40 provides information 43 to present the requested applications 41 on the client computer 20." '745 Patent at 8:56-9:12.

- "***In accordance with one aspect of the present invention*** ….  For example, a droplet-enabled email application may be implemented a number of ways such that a first version may operate on a ***personal computer*** having capabilities for full color, high resolution graphics and a second version for operating on an ***internet-enabled radio telephone*** having only text processing capabilities. ***In accordance with this aspect of the present invention***, a droplet ***communicates one of the differing client environments*** and, in particular, client UI requirements, to the application server." '745 Patent at 9:18-36.

---

communication connection 54 to the application server. . . .").  Accordingly, Defendants have included this possibility in the last clause of their proposed construction.

- "The information identifying a client computer's operating environment provides the application server 40 a means for presenting a droplet-enabled application having a user interface customized to the capabilities of the client computer's operating systems and hardware." *Id.* at 13:28-32.

Thus, "operating environment" includes at least hardware, as in Defendants' construction.

In contrast, Droplets' proposal is so overly broad that it would give Droplets room to argue "accessibility" information alone can be the "operating environment information." But the word "accessibility" does not appear at all in the patents-in-suit, and it is not even clear what Droplets means by accessibility. Indeed, Droplets' construction would inject ambiguity into the scope of the patents. Accordingly, the Court should reject Droplets' overly broad proposal and adopt Defendants' proposed construction so that "operating environment information" includes, at least, identification of the client's hardware.

### H.     "operating system environment information" ('838 Patent, Claim 29)

| Droplets | Defendants |
|---|---|
| Information relating to the client computer's operating system, user interface, accessibility, or hardware capabilities. | Plain meaning, or, alternatively, "information relating to the client computer's operating system" |

No construction is necessary for this term. The term is not recited anywhere in the patents' specification, so there is no reason to modify the plain and ordinary meaning of the term, *i.e.*, information relating to the client computer's ***operating system***.

Droplets' proposed construction asks this Court to construe this term so that information wholly unrelated to the operating system—including information solely relating to "accessibility" or "hardware" capabilities—could be "operating system environment information." This is illogical and unnecessary. As such, the Court should conclude that no construction is necessary, or adopt Defendants' alternate construction of "information relating to the client computer's operating system."

## V.     CONCLUSION

Droplets' infringement allegations against Defendants are premised on persuading this Court to expand its patents beyond their proper scope, as defined in the patents' specification and

through Droplets' own repeated, unequivocal, clear, and unmistakable disclaimers during patent

prosecution.  For the foregoing reasons, Defendants respectfully ask the Court to refuse Droplets'

attempted expansion and instead adopt Defendants' proposed constructions.

Dated:  May 10, 2013                    Respectfully Submitted,


                                By:    */s/ Michael B. Levin*_____

                                        Michael B. Levin
                                        mlevin@wsgr.com
                                        WILSON SONSINI GOODRICH & ROSAT
                                        Professional Corporation
                                        650 Page Mill Road
                                        Palo Alto, California 94304
                                        Telephone: 650.493.9300
                                        Facsimile: 650.493.6811

                                        Brian Range
                                        brange@wsgr.com
                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
                                        900 South Capital of Texas Highway
                                        Las Cimas IV, Fifth Floor
                                        Austin, Texas 78746-5546
                                        Telephone: 512.338.5400
                                        Facsimile: 512.338.5499

                                        Larry L. Shatzer
                                        lshatzer@wsgr.com
                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
                                        1700 K Street, NW, Fifth Floor
                                        Washington, DC 20006
                                        Telephone: 202.973.8800
                                        Facsimile: 202.973.8899

                                        Jessica Leigh Margolis
                                        jmargolis@wsgr.com
                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
                                        1301 Avenue of the Americas, 40th Floor
                                        New York, NY 10019
                                        Telephone: 212.999.5800
                                        Facsimile: 212.999.5899


                                        -24-

**Counsel for Defendants,
E\*TRADE FINANCIAL CORPORATION,
E\*TRADE SECURITIES, LLC, E\*TRADE
BANK, TD AMERITRADE HOLDING
CORPORATION, TD AMERITRADE, INC.,
SCOTTRADE, INC. AND SCOTTRADE
FINANCIAL SERVICES, INC., THE
CHARLES SCHWAB CORPORATION,
CHARLES SCHWAB & CO., INC., CHARLES
SCHWAB BANK**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 10, 2013, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.2.

<u>/s/ Michael B. Levin</u>
Michael B. Levin