UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

DROPLETS, INC.,

        Plaintiff,

  -against-                                          No. 12 Civ. 2326 (CM)

E*TRADE FINANCIAL CORP., et al.,

        Defendants.

------------------------------------------------------------x

## CLAIM CONSTRUCTION

### The '745 patent

The Abstract describes the invention as "a method and system . . . for delivering interactive links for presenting applications and second information at a client computer from remote sources in a network-configured computer processing environment." ('745 Patent, Droplets' Ex. A, Abstract).

The Field of the Invention describes the invention as "an object-oriented approach for delivering interactive links to applications and information stored in remote sources of a network." (*Id.* 1: 27-30).

The first independent claim claims "a method for delivering interactive links for presenting applications and information from remote sources on the network" in "a network configured computer processing system having a plurality of client computers and a plurality of host computers." (*Id.* 29:65-67, 30:1)

The four Objects of the Invention that encapsulate all the terms that will be discussed in this *Markman* opinion include:

(1) "provid[ing] interactive links to applications and information remotely stored across a network;"

(2) "provid[ing] graphical representations of interactive links to remotely stored applications and information [which are themselves] downloadable to client computers and selectively employed to retrieve and present the remotely stored applications and information on the client computers;"

(3) "provid[ing] [said] graphical representations of interactive links…[that are] transferable between one or more client computers for selectively retrieving and presenting remotely stores applications and information on each of the client computers;"

(4) "providing [said] interactive links…….wherein when selectively employed to retrieve and present remotely stored applications and information on a client computer, a previous operating state of the applications and information may be restored."
(*Id.* at 4:8-30)

The summary of the invention indicates that it consists of "interactive links for retrieving applications and information from remote sources in a network configured computer processing system." (*Id.* at 4:45-47)

Put simply, the invention comprehended by the patent in suit is a method designed to provide interactive links that will allow the user of an electronic device like a computer (client) to retrieve applications or information that are stored "remotely" (i.e., somewhere other than on the user's computer) and present them on an end user's device in a manner that is compatible with the parameters of that particular device. The interactive link is presented in the form of a graphical representation. The interactive link has to be capable of restoring a previous operating state of the applications and inventions when retrieve and presented.

The '745 patent application was filed on June 22, 2000 and the patent issued on February 3, 2004. Priority is claimed under 35 U.S.C. § 119(e) from co-pending Provisional Patent Application No. 60/153,917 filed September 14, 1999.

The '745 patent was reexamined at the request of Adobe after Droplets sued Adobe in the Eastern District of Texas. (the "Adobe Case"). Originally the Examiner disallowed all the claims of the '745 patent on reexamination. However, after Droplets settled with Adobe, the reexamination continued ex parte, and on March 11, 2011, a reexamination certificate was issued for the '745 patent, confirming its validity, with its 26 original claims unchanged and 78 claims added. (Droplets' Ex. A, pages 28-32).

Originally asserted in this action was a second patent, the '838 patent, which is a daughter patent of the '745. (Droplets' Ex. B). It is my understanding that this patent was recently invalidated upon reexamination. I will, therefore, proceed only on the ''745 patent – although the same definitions must be used in parent and child patents, so construction of these claim terms would apply to the '838 were it to be resurrected by the Patent Office.

### The Disputed Claim Terms: Principles of Claim Construction

The claims in a patent define the scope of the patent right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention, unless there is clear evidence in the patent's specification or prosecution history that the patentee intended a different meaning. *Id.* at 1312–13. Claim construction is informed by the intrinsic evidence such as a patent's specification and prosecution history. *Id.* at 1315–17. Only if that does not resolve the issue should a court, in construing a claim, resort to extrinsic evidence. *Brassica Prot. Products LLC v. Caudill Seed & Warehouse Co., Inc.*, 591 F. Supp. 2d 389, 394-95 (S.D.N.Y. 2008).

The specification "is always highly relevant to the claim construction analysis." *Id.* at 1315. For example, "the specification may reveal a special definition given to a claim term by

the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. Indeed, "a claim term may be clearly redefined without an explicit statement of redefinition.... [T]he written description of the preferred embodiments can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *Bell Atl. Network Servs. v. Covad Commc'ns Grp. Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citations and internal quotes omitted). The specification may also help resolve the meaning of an otherwise ambiguous claim term. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

That said, when consulting the specification for the purpose of construing claims, courts should "avoid the danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323. "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Id.* The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* This is due to 35 U.S.C. § 112 (dealing with the requirements of a patent's specification), and the fact that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.* Limitations in a specification should only be read into claims if the patentee was "his own lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction." *E-Pass Techs., Inc. v. 3 Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012); *SRI Int'l v. Matsushita Elec. Corp. of*

*Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Prosecution history is also "intrinsic evidence," *Phillips*, 415 F.3d at 1317, and because the prosecution history is the complete record of all the proceedings before the Patent Office, including the applicant's representations regarding claim scope, it "is often of critical significance in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Even when the written description would otherwise support a construction, the prosecution history, which is generated afterwards, can relinquish coverage of that claimed embodiment." *JOAO v. Sleepy Hollow Bank*, 418 F. Supp. 2d 578, 581 (S.D.N.Y. 2006) (citing *Rheox, Inc. v. Entact*, 276 F.3d 1319, 1325-27 (Fed. Cir. 2002)), *aff'd*, 445 F. App'x 359 (Fed. Cir. 2011). A patentee may not recapture through claim construction the claim scope it gave up during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Indeed, prosecution disclaimer binds a patentee even if the patentee's statements were not offered to overcome a rejection and even if the statements were not necessary to overcome a rejection. *See USHIP Intellectual Props., LLC, v. United States*, No. 2012-5077, 2013 WL 1891406, at *4 (Fed. Cir. May 8, 2013) (holding that patentee would be held to limiting statements made in prosecution).

Prosecution history includes any reexamination of the patent, and an "applicant's argument [in reexamination] that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011); *see also Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) ("A patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer."). Indeed, "[a]n applicant's argument made during

prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005) (citation omitted).

It is also true, however, that "prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage." *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *Purdue Pharma L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). "To be given effect, such a disclaimer must be made with reasonable clarity and deliberateness." *Superguide*, 358 F.3d at 875; *see also Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010).

Claims may also be instructive as to the meaning of terms or phrases found within them. *Phillips*, 415 F.3d at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms."); *see also Touchtunes Music Corp. v. Rowe Int'l Corp.*, 727 F. Supp. 2d 226, 230 (S.D.N.Y 2010). Further, "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." Phillips, 415 F.3d at 1314; *see also Inv. Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, Nos. 1:07-cv-510 & 1:07-cv-6886, 2010 U.S. Dist. LEXIS 3588, at *9 (S.D.N.Y. Jan. 19, 2010) (citing *Phillips*, 415 F.3d at 1314). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314; *see also Takeda Pharm. Co. v. Mylan, Inc.*, No. 1:12-cv-24, 2012 U.S. Dist. LEXIS 148196, at *22 (S.D.N.Y. Oct. 11, 2012).

Finally, "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). In particular, the Court may properly resolve the parties'

dispute simply by rejecting improper, unnecessary, or unhelpful proposed constructions. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325–26 (Fed. Cir. 2012); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *Stanacard, LLC v. Rebtel Networks, AB,* 680 F. Supp. 2d 483, 487–88 (S.D.N.Y. 2010).

Claims are to be construed from the viewpoint of a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. The level of ordinary skill is a function of many factors, including: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). Considering these factors in the context of the Patents-in-Suit, Droplets argues that one of ordinary skill in the art in the 1998–1999 timeframe would have had a B.S. degree, or its equivalent, in computer science. Defendants do not argue otherwise.

In their *Markman* briefs, Defendants seek to limit the construction of various claim terms, not only via prosecution history estoppel, but also by referring to statements made by Droplets in connection with the Adobe Case – in which claim construction was briefed but never decided. I assume that the Defendants are relying on the doctrine of judicial estoppel, which provides that "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).

Judicial estoppel is not the same thing as prosecution estoppel. Droplets' statements in briefs filed with the Texas court are extrinsic evidence, which this court will not consider if the patent claims can be construed solely on the basis of intrinsic evidence.

Because this *Markman* ruling relies entirely on intrinsic evidence, there is no need for this court to determine whether positions taken by Droplets in Texas were in fact inconsistent with positions taken here, would be complicated – an issue over which the parties strenuously disagree.

This does not in any way alter the fact that statements made by Droplets during the Adobe litigation would at a minimum qualify as party admissions for purposes of admissibility at trial, should they be relevant to any issues concerning patent validity or infringement.

## CONSTRUCTION OF DISPUTED CLAIMS

**(1)** **Application:** *a software program that executes specific tasks for an end user.*
"Application" is a term so commonly used, and so well known -- not only to those skilled in the art, but also to everyone who uses computers -- that it is not surprising to see both sides more or less define it in accordance with its commonly understood meaning. A problem arises only when the parties try to add more to the definition that the word itself can bear.

The parties go on and on about whether, as a result of a disclaimer allegedly made by Droplets during prosecution, the patents in suit are limited to applications that "execute" on remote servers. That fight is very interesting—no doubt the issues of validity and infringement turn on this, in whole or in part—and both sides are able to muster support from the specification for their position, which portends a battle of the experts later in the case. But whether an application can execute on a user's device, as opposed to a remote server, has nothing to do with

how to define the word "application." Nothing in the definition adopted by the court precludes either party from raising this issue at a later time and in a more appropriate context.

Droplets objects to E-trade's insertion of the words "computer program" in place of the word "software," which it employs in its proposed definition. But Droplets used the phrase "software programs" in its communications about applications with the Patent Office . (See, e.g. Defendants' Ex. M at 51, 52). I am adopting Droplets' own language ("software program") in preference to E-trade's ("computer program").

(2)     **Presenting . . . The Application** -- Since "application" is defined above, the only item up for discussion is the meaning of "presenting." Both parties agree that "presenting" means "displaying" the application and "enabling interaction with the user according to user interface requirements." I am happy to adopt their joint definition: "presenting the application" means *"displaying software that executes specific tasks for an end user and enabling the user to interact with that program according to the user interface requirements."*

Defendants ask the court to further limit "presenting….the application" by requiring that the application be displayed "across a network." This, again, is not definitional – the argument appears to derive from E-trade's position, already rejected in connection with my construction of the word "application," that the definition of "application" must include a limitation to applications that execute on a remote server. As I explained above, that limitation has nothing to do with how to define the word "application"; it has even less to do with how to define the word "presenting." It is a merits argument, not a claim construction argument, and nothing in this decision should be read as foreclosing E-Trade from making it.

(3)     **Interactive link/Link** – "Link" is another commonly used computer term; it refers to computer code that, when selected by an end user (generally by "clicking" on its visual

embodiment with a mouse), connects the user to other bits of code. In common parlance, links are selected by an end user when he wishes to retrieve data from the Internet and present (display) that data at his own terminal. Droplets recognizes as much in its specification, when it says, "By selecting links and employing a web browser, a user may 'navigate' from one document to another, and from one web site to another, to access informational content and services available across the web." (Ex. A 2:50-55).

Frankly, the term "link" is so ubiquitous, and so commonly understood among computer users (even by this court, and I most assuredly do not fall within the group of persons "skilled in the art"), that I was tempted to say "plain meaning" and leave it at that. However, in connection with the patents in suit the operative term is really not "link" but "interactive link;" and in the term "interactive link," we have a clear case of the patentee acting as his own lexicographer.[1]

Defendants are of course correct that a link is by definition "interactive," in that, when an end user clicks, the link responds by taking some action. Put otherwise, a "link" cannot be text that, when selected, is not "actionable" (plain text). However, in the specification, the phrase "interactive link" is used by Droplets to describe something quite specific: code that, when selected by an end user, meets two separate requirements:

(1) It retrieves and present applications and/or information stored at remote locations across the network; and

(2) It includes facilities for restoring previous operating states of the application as the application is re-presented at a user's computer.

*Id.* at 3:66-4:5. That seems to me to be a perfectly acceptable core definition of the term "interactive link" as used in the '745 patent. It is easily understood by a jury and encompasses

---

[1] Because I believe that the patentee has defined the term "interactive link" separately from the more general term "link," I reject Defendants' argument that the two terms should be conflated. Indeed, as will be seen, the patentee has defined an interactive link in terms of two requirements, the first of which is common to all links, the second of which is apparently peculiar to Droplets' "interactive link."

everything that Droplets expects its claimed "interactive link" to do. And it differentiates Droplets' "interactive link" from "links" that meet only the first of those two requirements. Indeed, Droplets admits in its reply brief (at 10), it is the facility described in Requirement (2) that distinguishes the claimed invention from the links known in the prior art.

Actually, both sides agree that Droplets' "interactive link" must meet Requirement (2). Defendants would have the court define the term "interactive link" as precisely that – Requirement (2) and nothing more. It asks me to drop any reference to Requirement (1) – which describes the characteristic nature of all links -- in view of Droplets' concession (apparent throughout the specification) that many types of software which can "retrieve and present applications stored at remote locations across the network" predate the patent in suit, and so qualify as prior art. The items so disclaimed include specifically graphical user interfaces, windowed operating environments, browsers, internet shortcuts, web sites, URL links (location information), hyperlinks, search engines, bookmarks and cookies.

Droplets, for its part, wants the court to define "interactive link" as "a link and information relating to an operating state of an application. Since the word "link" refers to code that can perform Requirement (1), I gather that Droplets believes the phrase "information relating to an operating state of an application" is a clearer way of explaining Requirement (2). With this suggestion, I am constrained to disagree. The language of the specification that I have quoted above is much clearer.[2]

I will thus use the following "core definition" for the term "interactive link:" *computer code that (1) retrieves and presents applications and/or information stored at remote locations across the network when selected by an end user, and (2) includes facilities for restoring*

---

[2] The language previously offered by Droplets in the Adobe litigation is, frankly, incomprehensible.

*previous operating states of the application as the application is re-presented at a user's computer.*

Defendants would have the court add a second sentence to this definition: "Based on Droplets' disclaimer, an interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL)." They assert that Droplets acknowledged during patent prosecution that such items were prior art and specifically disclaimed that they could be the "interactive link" described in the patent.

Droplets did indeed tell the Patent Office that URLs and Internet shortcuts "cannot perform the functions of interactive links as claimed," and manual URL address inputs, bookmarks or special browser icons were not "an interactive link as claimed." Those statements qualify as clear disclaimers. Droplets is bound by them and cannot use a broad definition to recapture them (which is what Defendants fear Plaintiff is trying to do).

Droplets also stated, in the specification, that in the prior art, a link could be a hyperlink. *Id.* 2:51-52. And indeed, Droplets would be hard pressed to claim that it had patented the hyperlink in 1999.

As Droplets has specifically disclaimed that any of these clear instances of prior art are the "interactive link" in its invention, one would think it should have no objection to the addition of Defendants' proposed sentence to the core definition of "interactive link." In its reply claim construction brief, Droplets insists that it is not seeking to recapture disclaimed claim scope because the plain text URL links, hyperlinks, bookmarks and cookies that existed at the time of the invention did not have "facilities for restoring previous operating states of the application." But Droplets insists that it would be inappropriate to add the seemingly inoffensive sentence to

the definition of "interactive link" because the understanding of these terms has changed since 1999, when the provisional application for what became the '745 patent was filed.

I have absolutely no way of knowing whether or not that is true (to the extent that I am familiar with these terms in my capacity as an occasional computer user and Internet browser, the meaning of familiar terms like "URL address" and "Hyperlink" and "bookmark" has not changed over the years, but as I am not one skilled in the art, my understanding is not the test). One thing I do know is that the arguments for and against the addition of the sentence proposed by Defendants to the definition of "interactive link" cannot be resolved without reference to extrinsic evidence relating to the meaning of the disclaimed terms in 1999 and thereafter, including at the time Droplets was in discussions with the Patent Examiner. If the meaning of these terms has not changed, I can see no reason to exclude from the definition of the term "interactive link" the sentence: : "*An interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL)*." The parties have until November 15, 2013, to submit extrinsic evidence on that limited issue.

Finally, E-Trade also tries to introduce into the definition of "interactive link" some notion of where the link is "stored," limiting the location of storage to the client computer. Defendant's argument in this instance has no merit; Claim 16 of the '745 patent, for example, provides for "storing of the interactive link in….the internet-based repository" (i.e., the server).

**(4) Operating environment information/information relating to the operating environment** – This phrase refers to information (data) about the client computer's "operating environment." The patentee defined the term "operating environment" to include three things: the client computer's operating system, user interface and hardware capabilities. '745 Patent 11:38-40. (Emphasis added). Droplets did not include the word "accessibility" in the

specification's discussion of what it meant by "operating environment," and neither will this court – although I note that user interface and hardware capabilities will obviously have the effect of making the operating environment more or less accessible. I will define the term for the jury as *"information about a client computer's operating system, user interface and hardware capabilities."*

Defendants would have the court limit "operating environment information" to "information identifying client computer hardware." The specification is not so limited -- and indeed, in its brief, E-Trade admits that the operating environment can include information about things other than client hardware. It argues, however, that operating environment information must *at least* include information that identifies the client's computer hardware.

I agree with Defendants on this point, but I do not agree with their proposed solution. The specification plainly and repeatedly states that "information identifying the operating environment on the client computers provides information to the application server retarding the operating system *and* hardware capabilities of the particular client computer that requested the droplet-enabled content." (*Id.* at 8:63-37; *see also id.* at 13:28-32). (Emphasis added). The connector in the specification is "and," not "or," and that is entirely understandable, as information about both hardware and other capabilities is necessary to enable the appropriate presentation of the application or information that the interactive link retrieved. (*Id.* at 9:4-16) Droplets wants me to use the connector "or" when I define this term for the jury, but I believe "and" is more appropriate and consistent with the intrinsic evidence.

(5)  **Presentation information** – Again, "information" means data, and "presentation information" is data that dictates how the application or information retrieved by the interactive link will be "presented" to the end user. Droplets prefers to phrase this as: *"information for*

*presenting particular functionality to clients having different user interface requirements."* Although I think my formulation is more readily understood by a lay trier of fact, I am comfortable with Droplets' proposed definition and I will use it.

(6) **Presentation Client/Presentation Client Computer Program Code** – Both sides agree that the "presentation client" is software (computer code) located ("residing") on the client. The term "client" as used in the specification refers to various types of computerized electronic devices ("personal computers, work stations, portable and /or handheld devices or the like ("clients"), Id. at 2:23-25), so it would be redundant to say that the presentation client is located on the "client computer."

The specification contains a single sentence definition of "presentation client" and it is this: "In accordance with the present invention, the presentation client 25 is a generic, platform independent application program that processes user interface specifications received from the application server 40 and routes user driven events back to the application server 40 using message formats (e.g., event notification and session commands) discussed above." (*Id.* at 27:11-17). Unfortunately, this definition cannot be comprehended by a lay juror unless the parties define the term "platform independent." E-Trade does this when it argues that platform independent software is software that will "cooperate with" a web browser when in a web-based environment or with stand-alone software in non-web-based environments. The phrase "cooperates with" comes directly from the specification's discussion of how the presentation client interfaces with web browsers (*Id.* at 10:59-64, 11:6-13; 27:23-25).

Droplets asserts that its formulation -- "receiving user input and presenting remotely stored applications to users" -- is more closely aligned with the intrinsic record. But this ignores the importance of the phrase "platform independent" in its own specification. Indeed, it appears

that the three embodiments of "presentation client" set forth at the bottom of page 22 and the top of page 23 of Droplets' Claim Construction Brief describe exactly what E-Trade proposes the definition to say: the presentation client can do what it is supposed to do (process user interface specifications and route user driven events back to the application server) whether the end user has a web-based and non-web-based operating environment.

While the software must reside on the client device in order to qualify as "presentation client computer program code," it is not necessary to ascertain whether the software "resides" on the client because it was "installed" or because it was "imported" or because it got there in some other way. I must say, to a lay person such as myself, the word "installed" is broad enough to encompass many different methods of installation, including downloading and being built into a web browser. However, I appreciate that one skilled in the art might draw some distinction of significance between code that is "installed" and code that is "downloaded" or "built in."

I will define this term as: *"a generic application program, capable of cooperating with a web browser when in a web-based environment or with stand-alone software in non-web-based environments, that processes user interface specifications received from the application server and routes user driven events back to the application server."*

(7)  **Re-establishing** – The word means *"restoring."* That is all the word means. What is restored (re-established) depends on the words that surround the word "re-establishing." If, by reading "re-establishing" in its context, it becomes clear that prior art precludes a finding a validity, then so be it. But the claim construction process cannot be used to short-circuit such analysis.

Dated: October 21, 2013

                                                   _____

                                                               U.S.D.J.

BY ECF TO ALL COUNSEL